UNITED STATES of America, Plaintiff,

v.

TUCOR INTERNATIONAL, INC., et al., Defendants.

No. CR–92–0425 DLJ.

United States District Court, N.D. California.

June 15, 1998.

Joseph O. Click, San Francisco, CA, James R. Wyrsch, Wyrsch Hobbs Marakian & Lee, Kansas City, MO, Jerrold M. Ladar, Ladar & Ladar, San Francisco, CA, Warren L. Dean, Jr., Dyer Ellis & Joseph, Washington, DC, for Philippine–American Moving & Storage Corp.

Joseph O. Click, San Francisco, CA, Jerrold M. Ladar, Ladar & Ladar, San Francisco, CA, Warren L. Dean, Jr., Dyer Ellis & Joseph, Washington, DC, for Luzon Moving & Storage Corp., George Schulze, Sr.

## ORDER

JENSEN, District Judge.

On December 3, 1997, the Court heard argument on defendant Tucor Industries' petition for a writ of error coram nobis and the Luzon defendant's motion to dismiss the indictment. Reginald K. Tom and Roger W. Fones appeared on behalf of the United States; Warren L. Dean, Jr. appeared for Luzon Moving and Storage Corporation, Philippine–American Moving and Storage Corporation, George Schulze, Sr., and George Schulze, Jr.; James R. Wyrsch, Charles M. Rogers, Phillip Torres and Jerrold M. Ladar appeared for Tucor Industries, Inc. Having considered the arguments of counsel, the papers submitted, the applicable law, and the record in this case, the Court hereby GRANTS the Luzon defendants' motion to dismiss the indictment and GRANTS Tucor Industries's petition for a writ of error coram nobis.

## I. BACKGROUND

A. *Factual Background and Procedural History*

Defendants are corporations and individuals engaged in the business of transporting goods to and from United States military bases in the Philippines. Defendants were indicted on September 9, 1992 for violating Section 1 of the Sherman Act, 15 U.S.C. § 1. The indictment charges that defendants [1] conspired "to suppress competition by fixing prices for moving services supplied in connection with the transportation of military shipments of household goods between the Philippines and the United States." Indictment ¶ 2. Defendants contend that because they provided transportation services solely within the Philippines, any price fixing activity was not unlawful pursuant to the Shipping Act of 1984, § 7(a)(4), 46 U.S.C.App. § 1706(a)(4).

### 1. *The Tucor Defendants*

Tucor Industries, Inc. is a Philippine company that is affiliated with and partly owned by Tucor International, Inc. Defendants Patrick B. Boll and Dale C. Bailey were corporate officers of defendant Tucor Industries. The indictment charged defendants Tucor International, Tucor Industries, Boll and Bailey ("the Tucor defendants") with one count of conspiring to fix prices in violation of the Sherman Act, 15 U.S.C. § 1.

At their arraignment following the return of the indictment, the Tucor defendants entered pleas of not guilty. On November 18, 1992, the Tucor defendants filed various pretrial motions, including two motions challenging the jurisdiction of the Court. In one of these motions, defendants sought "dismissal of indictment on the grounds of primary jurisdiction, implied immunity, § 6A, and vagueness." In the other, defendants moved "to dismiss the indictment on grounds of jurisdiction and comity." The United States filed memoranda in opposition to these pretrial motions. The Court conducted a hearing on defendants' motions on December 2, 1992.

While the Tucor defendants' motions to dismiss were under submission, the parties filed a plea agreement with the Court. The Court held a plea hearing on June 16, 1993.[2]

---

**1.** The original indictment was brought against Tucor International, Inc.; Tucor Industries, Inc. d/b/a Tucor Moving and Storage; Philippine–American Moving & Storage Corp.; Luzon Moving & Storage Corp.; D.M. Nazareno & Sons, Inc.; Apex Moving & Storage Corp.; Jose C. Singson, Jr.; George Schulze, Sr.; George Schulze, Jr.; Arturo G. Nazareno; Patrick B. Boll; and Dale C. Bailey.

**2.** At the hearing, defendants were represented by Phillip Torres and Jerrold Ladar, both of whom remain as current counsel for Tucor Industries in this matter.

During the hearing, the Court accepted Tucor Industry's guilty plea and imposed a sentence of a $121,800 fine and a $200 special assessment. Pursuant to the plea agreement, the United States moved to dismiss the charges against defendants Tucor International and Bailey.[3] Judgment was entered against Tucor Industries on June 22, 1993. *See* June 22, 1993 Judgment, as amended on June 25, 1993.

On August 15, 1997, defendant Tucor Industries ("Tucor") filed a petition for a writ of error coram nobis. Tucor argues that the Shipping Act of 1984 exempted it from criminal liability for price fixing and hence the conduct charged in the indictment could not constitute a crime. Tucor seeks to set aside its June 16, 1993 guilty plea.

The government filed its opposition to defendant's petition on September 10, 1997. Defendant filed its reply on September 22, 1997. At an October 8, 1997 hearing on the matter, the Court ordered the United States to provide further briefing regarding the applicability of the Shipping Act immunities to the conduct charged in the indictment. On November 7, 1997, the United States filed a supplemental memorandum in opposition to Tucor's petition to which Tucor filed a reply on November 10, 1997.

### 2. *The Luzon Defendants*

Defendants Luzon Moving & Storage Corp. ("Luzon"), Philippine–American Moving & Storage Corp. ("PAMSC"), George Schulze, Sr. and George Schulze, Jr. were charged with one count of conspiring to fix prices in violation of the Sherman Act, 15 U.S.C. § 1. Luzon and PAMSC claim to be corporations organized under Philippine law with their principle and sole place of business in the Philippines. Defendants George Schulze, Sr. and George Schulze, Jr. claim to be Philippine citizens who reside in the Philippines and are officers and sole shareholders of defendants Luzon and PAMSC. These defendants have not appeared before this Court for arraignment.

3. Defendant Boll died on April 16, 1993 and thus was not part of the plea agreement.

4. Following the December 3, 1997 hearing on the Luzon defendants' motion and Tucor's petition, the Court received a number of submissions

On August 15, 1997, defendants Luzon, PAMSC, Schulze, Sr., and Schulze, Jr. ("the Luzon defendants"), filed a motion for leave to make a special appearance for the limited purpose of filing a motion to dismiss the indictment. On the same date, defendants also filed their motion to dismiss the indictment. The Luzon defendants contend that the Shipping Act of 1984, § 7(a)(4), 46 U.S.C.App. § 1706(a)(4), immunizes them from liability for antitrust violations and, as a result, the indictment should be dismissed. On September 10, 1997, the government filed its opposition to defendants' motion for leave to make a special appearance. The government did not, however, file an opposition to defendants' motion to dismiss the indictment.

In an order dated October 20, 1997, the Court granted the Luzon defendants motion for leave to make a special appearance to file their motion to dismiss the indictment. Pursuant to the Court's order at the October 8, 1997 hearing, the United States filed a memorandum on November 7, 1997 in opposition to defendants' motion to dismiss the indictment. The Luzon defendants filed a reply on November 19, 1997. The matter has now been fully briefed and is properly before the Court.[4]

### B. *Legal Standards*

#### 1. *Dismissal of Indictment*

■ Under Federal Rule of Criminal Procedure 12(b), "[a]ny defense, objection or request which is capable of determination without the trial of the general issue may be raised before trial by a motion." Fed. R.Crim.P. 12(b). In considering a pretrial motion to dismiss an indictment, the court "must presume the truth of the allegations in the charging instrument." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir.1996). The court should not consider evidence that does not appear on the face of the indictment. *Id; see also United States v. Chant*, 1997 WL 231105, *4 (N.D.Cal.1997). To grant a mo-

from the parties. *See* Government's Letter Briefs, received December 18, 1997 and January 23, 1998; Defendants' Letter Briefs, received December 23, 1997 and February 9, 1998 (responding to government's Letter Briefs).

tion to dismiss based on evidence outside the indictment would be tantamount to granting summary judgment for a criminal defendant. *See Jensen,* 93 F.3d at 669. Unlike in civil cases, there is no such summary judgment procedure in a criminal case. *Id.*

### 2. *Writ of Error Coram Nobis*

The writ of error coram nobis affords a remedy to attack a conviction when the defendant has served his sentence and is no longer in custody. *Telink, Inc. v. United States,* 24 F.3d 42, 45 (9th Cir.1994); *United States v. Walgren,* 885 F.2d 1417, 1420 (9th Cir.1989). Specifically, the "writ provides a remedy for those suffering from the 'lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact' and 'egregious legal errors.'" *Walgren,* 885 F.2d at 1420 (quoting *Yasui v. United States,* 772 F.2d 1496, 1498, 1499 & n. 2 (9th Cir.1985)).

■ The writ fills a very precise gap in federal criminal procedure. A convicted defendant in federal custody may petition to have a sentence of conviction vacated, set aside or corrected under the federal habeas corpus statute, 28 U.S.C. § 2255. *United States v. Hayman,* 342 U.S. 205, 207, 72 S.Ct. 263, 96 L.Ed. 232 (1952). If, however, the sentence has been served, there is no statutory basis to remedy the "lingering collateral consequences" of the unlawful conviction. *Yasui,* 772 F.2d at 1498. Recognizing this gap, the Supreme Court has held that the common law petition for writ of error coram nobis is available in such situations, even though the procedure authorizing the issuance of the writ was abolished in civil cases by Federal Rule of Civil Procedure 60(b). *United States v. Morgan,* 346 U.S. 502, 505 n. 4, 74 S.Ct. 247, 98 L.Ed. 248 (1954). District courts are therefore authorized to issue the writ in federal criminal matters pursuant to the All Writs Act, 28 U.S.C. § 1651(a), *id.* at 506, 74 S.Ct. 247, *Walgren,* 885 F.2d at 1420, but may not entertain a petition for the writ with respect to challenges to state convictions, *Sinclair v. Louisiana,* 679 F.2d 513, 513–15 (5th Cir.1982); *see also Madigan v.*

*Wells,* 224 F.2d 577, 578 n. 2 (9th Cir.1955) (writ of error coram nobis can only issue to aid jurisdiction of court in which conviction was had), *cert. denied,* 351 U.S. 911, 76 S.Ct. 700, 100 L.Ed. 1446 (1956).[5]

■ To qualify for coram nobis relief, four requirements must be satisfied: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case and controversy requirement of Article III; and (4) the error is of the most fundamental character. *Estate of McKinney v. United States,* 71 F.3d 779, 781–782 (9th Cir.1995) (citation omitted).

■ Coram nobis relief is not limited to individuals. A corporation, not in custody and thus without access to § 22554 relief, can use the writ to attack an unconstitutional conviction. *United States v.. Mett,* 65 F.3d 1531 (9th Cir.1995); *see also United States v. Rad–O–Lite of Philadelphia, Inc.,* 612 F.2d 740, 744 (3d Cir.1979) ("courts regularly have allowed corporations to petition for coram nobis").

## II. ARGUMENTS

Tucor has petitioned for a writ of error coram nobis to set aside its guilty plea. The Luzon defendants argue that the indictment against them should be dismissed. Both motions are founded upon defendants' contention that the conduct alleged in the indictment was immunized by the Shipping Act of 1984.

### A. *Shipping Act of 1984*

■ The parties dispute the scope of an exemption from antitrust liability found in Section 7(a)(4) of the Shipping Act of 1984, 46 U.S.C.App. § 1706(a)(4). Specifically, that section provides:

> The antitrust laws do not apply to … any agreement or activity concerning the foreign inland segment of through transporta-

---

**5.** A request for a writ of error coram nobis should be filed as a motion in the criminal case, rather than as a separate case. It "is a step in the criminal case and not, like habeas corpus

where relief is sought in a separate case and record, the beginning of a separate civil proceeding." *United States v. Morgan,* 346 U.S. at 505 n. 4, 74 S.Ct. 247.

tion that is part of transportation provided in a United States import or export trade. 46 U.S.C.App. § 1706(a)(4). According to the government, this section grants immunity only to ocean common carriers. Defendants, on the other hand, contend that the language, structure and purpose of the Shipping Act do not support the government's narrow construction of this exception.

### 1. *Statutory Interpretation*

 When interpreting a statute, this Court must look first to the plain meaning of the statute's language. *United States v. Neal,* 976 F.2d 601, 602 (9th Cir.1992). If the plain language appears to settle the question, the Court looks to legislative history only to determine whether there is clearly expressed legislative intent that is contrary to the plain language. *Id.* Only in rare or exceptional circumstances will the plain language not control if the statute is unambiguous. *United States v. LeCoe,* 936 F.2d 398, 402 (9th Cir.1991). If the plain language does not settle the question, then the Court looks to other sources, such as the legislative history, to decipher the meaning of the ambiguous language. In a criminal case, ambiguous language must be interpreted in defendant's favor under the rule of lenity. *See Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980); *United States v. Carpenter,* 933 F.2d 748, 751 (9th Cir.1991); *United States v. Plaza Health Laboratories, Inc.,* 3 F.3d 643, 649 (2d Cir. 1993).

#### a. *Plain Meaning of the Statute*

As noted above, Section 7(a)(4) of the Shipping Act of 1984 provides that "[t]he antitrust laws do not apply to . . . any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade." 46 U.S.C.App. § 1706(a)(4). On its face, this immunity does not appear to be limited to agreements by or among ocean carriers as suggested by the government. Instead, it appears that the immunity would apply to an agreement between companies providing foreign inland moving services so long as the services were part of "through transportation."

The government correctly points out that the plain meaning to be discerned is not the plain meaning of an isolated provision, but instead the plain meaning of the whole statute. Gov't Supp. Mem. at 6:4–14 (citing *Beecham v. United States,* 511 U.S. 368, 372, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994); *John Hancock Mut. Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 94, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993)). According to the government, looking at the Section 7 immunities in light of Section 4 of the Act makes clear that defendants' interpretation of Section 7 is inconsistent with the plain meaning of the statute.

Entitled "Agreements Within Scope of Act," Section 4 states that the Act applies to certain agreements "by or among ocean common carriers," and "among marine terminal operators and among one or more marine terminal operators and one or more ocean common carriers." *See* 46 U.S.C.App. § 1702(a) (ocean common carriers), § 1702(b) (marine terminal operators). No other agreements are mentioned in that section. According to the government, agreements among foreign motor carriers do not fall within Section 4 and are therefore outside the scope of the Act.

Defendants contend that the government is, in effect, reading the word "only" into Section 4. Section 4(a) states that "this chapter applies to agreements by or among ocean common carriers . . . ." It does not state that this chapter "only" applies to those agreements. Rather than limit the Section 7 exemptions, defendants argue, Section 4 merely defines the types of agreements for which a filing must be made under Section 5 [6] and for which immunity under Section 7(a)(1) and 7(a)(2) will apply.

##### i. *Section 7(a) Exemptions*

Section 7 of the Act provides six exemptions from antitrust liability:

The antitrust laws do not apply to—

---

**6.** Section 5(a), 46 U.S.C.App. 1704(a), requires the filing of a conference agreement with the FMC. Section 5(b), 46 U.S.C.App. 1704(b), sets forth the requisite contents of any filed confer-

ence agreement, and section 6, 46 U.S.C.App. § 1705, governs the disposition of filed agreements.

(1) any agreement that has been filed under section 1704 of this title and is effective under section 1704(d) or section 1705 of this title, or is exempt under section 1715 of this title from any requirement of this chapter;

(2) any activity or agreement within the scope of this chapter, whether permitted under or prohibited by this chapter, undertaken or· entered into with a reasonable basis to conclude that (A) it is pursuant to an agreement on file with the Commission and in effect when the activity took place, or (B) it is exempt under section 1715 of this title from any filing requirement of this chapter;

(3) any agreement or activity that relates to transportation services within or between foreign countries, whether or not via the United States, unless that agreement or activity has a direct, substantial, and reasonably foreseeable effect on the commerce of the United States;

(4) any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade;

(5) any agreement or activity to provide or furnish wharfage, dock, warehouse, or other terminal facilities outside the United States; or

(6) subject to section 1719(e)(2) of this title, any agreement, modification, or cancellation approved by the Commission before the effective date of this chapter under section 814 of this title, or permitted under section 813a of this title, and any properly published tariff, rate, fare, or charge, classification, rule or regulation explanatory thereof implementing that agreement, modification or cancellation.

46 U.S.C.App. § 1706. The government takes the position that each of these exemptions only reaches agreements of or between ocean common carriers. If any one of these provisions grants immunity to an agreement not involving an ocean common carrier, then the government's argument—that Section 4 limits the scope of the Act to agreements with ocean common carriers—must fail.

The government's position is that exemptions (1) and (2) apply to agreements filed under the Act, while (3) through (5) apply to ocean common carrier agreements that are described in Section 4, but exempted from filing under Section 5(a). Section 5(a) exempts from the filing requirements

agreements related to transportation to be performed within or between foreign countries and agreements among common carriers to establish, operate, or maintain a marine terminal in the United States.

46 U.S.C.App. § 1704(a). In essence, the government argues that exemptions (3) through (5) are gap-fillers that provide immunity for certain unfiled ocean common carrier agreements, but do not extend immunity to non-ocean common carrier agreements. .

Under the government's theory, exemptions (3) and (4) provide immunity for agreements related to transportation to be performed within or between foreign countries, since such agreements need not be filed under the Act. See 46 U.S.C.App. § 1704(a). The government explains that exemptions (3) and (4) are not redundant, although they do overlap. According to the government, exemption (3) provides immunity only for an agreement of an ocean common carrier relating to transportation within or between foreign countries where the agreement does not have a direct, substantial, and reasonably foreseeable effect on United States commerce. Exemption (4), on the other hand, supplements exemption (3) by immunizing agreements of ocean carriers relating to the foreign inland segment of "through transportation," which by its nature has an effect on United States commerce. Thus, the government argues that exemption (4) has independent significance even if both (3) and (4) are limited to the agreements of ocean common carriers.

Defendants identify several problems with the government's interpretation of these exemptions. First, defendants argue that Section 7(a)(3) can only be interpreted as applying to persons *other than* "ocean common carriers" in light of the Ninth Circuit's opinion in *Transpacific Westbound Rate Agreement v. Federal Maritime Commission,* 951 F.2d 950 (9th Cir.1991). In *Transpacific,* the Ninth Circuit upheld the FMC's determination that ocean carriers who operated between foreign ports did not fall within the

Act's definition of "ocean common carrier" and could not benefit from Section 7(a)(1) immunity by filing their foreign-to-foreign agreements with the FMC. *Id.* at 953. The Court approved the FMC's finding that a carrier is an "ocean common carrier" within the meaning of the Act, "only to the extent that it holds itself out to provide transportation between the United States and a foreign [country] ...." *Id.* Defendants point out that exemption (3) by its terms does not involve ocean transportation between the United States and a foreign country. Instead, the provision exempts agreements concerning services between foreign countries. Such agreements, under *Transpacific,* do not appear to be agreements involving "ocean common carriers."

Second, defendants contend that the government's "gap filling" theory misinterprets the "gap" created by Section 5(a) of the Act. Section 5(a) exempts from FMC filing "agreements related to transportation to be performed within or between foreign countries ...." 46 U.S.C.App. § 1704(a). It is the government's position that the activities described in exemptions (3) and (4), when performed by ocean common carriers, would not be filed under Section 5(a) or immunized under Section 7(a)(1) or 7(a)(2). Exemptions (3) and (4) would provide immunity to these agreements not otherwise covered.

The government's argument ignores the fundamental distinction between "transportation to be performed within or between foreign countries" and "the inland segment of through transportation." Exemption (3) deals with the former and could arguably fill a gap created by Section 5(a). Exemption (4), on the other hand, deals with through transportation, a term of art under the Act, and Section 5(a) in no way exempts ocean carriers from filing agreements relating to the foreign inland segment of through transportation.

### ii. *Section 7(b)*

Section 7(b) states the types of agreements to which the Act does not extend antitrust immunity. Defendants look to Section 7(b)(1) for support of their position that the Section 7(a)(4) exemption is not limited to ocean common carriers. Section 7(b)(1) provides:

This chapter does not extend antitrust immunity to any agreement with or among air carriers, rail carriers, motor carriers, or common carriers by water not subject to this chapter with respect to transportation within the United States.

46 U.S.C.App. § 1706(b)(1). Defendants contend that if Section 7(a)'s antitrust immunities apply only to agreements of ocean common carriers, as the government contends, then Section 7(b)(1)'s preservation of antitrust liability for agreements among motor carriers would be superfluous.

In response to this argument, the government asserts that defendants ignore the fact that 7(b)(1) speaks of agreements *with and among* motor carriers. According to the government, 7(b)(1) reflects a legislative compromise designed to allow ocean carriers to agree on overall through rates, but not to enter into agreements with domestic inland carriers. Yet the government fails to explain why 7(b)(1) refers to agreements "among" motor carriers. If only agreements "with" ocean common carriers were entitled to immunity under the act, there would be no need to reserve liability for agreements "among" domestic carriers. The presence of such a provision strongly supports defendants' position that the immunity under the Act reaches beyond agreements of ocean common carriers.

### iii. *Conclusion: Plain Meaning*

This Court concludes that the Section 7(a)(4) immunity means what it says, and is not limited by Section 4. The government's attempt to limit the scope of the immunity by reading "only" into Section 4 of the Act is unconvincing for several reasons. First, the interpretation of Section 7(a)(3) offered by the government is undermined by the Ninth Circuit's decision in *Transpacific.* Second, the government's interpretation of Section 7(a)(4) fails to recognize the ocean common carrier's obligation to file agreements relating to the foreign inland segment of through transportation. Third, the language of Section 7(b)(1) suggests that Congress understood the grant of immunity to extend to agreements among motor carriers unless explicitly withdrawn as in that section. Thus, the Court concludes that the plain meaning

of the statute does not support limiting the scope of the Section 7(a)(4) immunity to agreements of ocean common carriers.

### b. *Legislative History*

Since the plain language appears to settle the question, the Court looks to legislative history only to determine whether there is clearly expressed legislative intent that is contrary to the plain language. *United States v. Neal,* 976 F.2d 601, 602 (9th Cir. 1992). Only in rare or exceptional circumstances will the plain language not control if the statute is unambiguous. *United States v. LeCoe,* 936 F.2d 398, 402 (9th Cir.1991). The Court will now review the legislative history in order to determine whether the interpretation urged by the government is compelled by clearly expressed legislative intent.

The government points to legislative history that could arguably support its position that Section 4 was intended to limit the scope of the Section 7 immunities. In the 97th Congress, the Senate Judiciary Committee amended Section 4 of H.R. 4374, the proposed "Shipping Act of 1982". The committee changed the title of the section from "Authorized Activities" to "Agreements Within Scope of the Act." A similar change was made in the introductory sentence of Section 4(a) which was amended to state that "This act applies to agreements among ocean carriers . . . ." H.R.Rep. No. 97–611, Pt. 2 at 3 (1982). The Committee explained that

> [t]hrough these changes, the Committee makes clear that this section is not intended to define what conduct is or is not authorized under the Act, but rather to indicate the scope of the Act for purposes of defining the breadth of the antitrust exemption set forth in Section 7 of the bill.

H.R.Rep. No. 97–611, Pt. 2 at 31 (1982). In the following Congress when the Shipping Act was passed, the House Merchant Marine and Fisheries Committee said of Section 4 that "This section states the coverage of the bill. It lists the type of agreements to which the bill applies. When read in connection with sections 4 and 7, the effect is to remove the listed agreements from the reach of the antitrust laws as defined in the bill." H.R.Rep. No. 98–53, Pt. 1 at 29 (1983).

Defendants contend that the above quoted references to "Section 7" are really only references to the first exemption found in Section 7. Defendants point out that at when the Judiciary Committee amended Section 4 as described above, the Committee also made significant changes to Section 7 of the Act. In explaining the changes to the Section 7(a)(1) exemption, the Committee stated that the 7(a)(1) provision "defines the scope of the full antitrust immunity conferred by the bill." H.R.Rep. No. 97–611, pt. 2 at 32–33 (1982). Under these circumstances, defendants argue that the description of Section 4 as indicating "the scope of the act for purposes of defining the breadth of the antitrust exemption" can only be read as a reference to Section 7(a)(1).

For affirmative support of their position that Section 7(a)(4) is not limited to agreements with or among ocean common carriers, defendants point to the influence of the Council of European and Japanese National Shipowners Association (CENSA) on the development of an earlier version of the legislation. CENSA proposed an amendment to the 1981 Senate bill, S. 1593, that would have added the following category to the list of agreements granted antitrust immunity:

> any agreement that concerns or involves joint or through intermodal transportation, or other transportation and related services between or within any foreign country or place . . . .

In commenting on the antitrust immunities of the bill, CENSA's representative testified as follows:

> The word "solely" in Section 8(a)(3) could be construed, for example, as excluding from the intended antitrust law exemption arrangements by conferences or ocean carriers for inland *foreign* motor, rail or air transportation in connection with intermodal routes and services. Also to be kept in mind is the fact that other countries take strong issue with the application of the antitrust laws as well as the Shipping Act to transportation arrangements and activities performed within their jurisdictions. Our suggested amendment to Section 8(a) would implement the policy objective of harmonizing U.S. practices with those of its trading partners and would reduce jurisdictional friction and confrontations.

Surely, applications of the antitrust laws to consolidating and forwarding arrangements and services in other countries as envisaged in the present wording of Section 8(a)(5) would wrongfully invade the jurisdictions of trading partner sovereigns.

Def. Exh. 24, *1981 Shipping Act: Hearing Before Subcommittee on Merchant Marine of the Senate Committee on Commerce, Science and Transportation,* 97th Cong. 208 (1981) (statement of Dr. Henry De La Trobe, Vice Chairman, CENSA).

Although the Senate Report on S. 1593 did not refer to the CENSA testimony, the reported bill did contain changes which appear to have addressed CENSA's concern. As introduced, the bill would have provided antitrust immunity to

. . .

(3) any agreement or activity that relates solely to transportation services between foreign countries;

(4) any agreement or activity that relates to shippers' councils operating exclusively outside the United States; and

(5) any agreement or activity to provide or furnish warfage, dock, warehouse, or other terminal facilities exclusively outside the United States.

S. 1593, 97th Cong., 1st Sess., §§ 8(a) at 15 (1991). The reported bill, on the other hand, contained the following exemptions: "any agreement or activity that relates solely to ocean or through transportation services within or between foreign countries whether or not via the United States" and "any agreement or activity concerning the inland portion of any intermodal movement occurring outside the United States, through part of transportation in a United States import or export trade." S. 1593, 97th Cong., 2d Sess ., § 8(a)(4) and (a)(5) at 56 (1982). To the extent that CESNA's input had an effect on a precursor provision to Section 7(a)(4), this tends to support defendants' position that the immunity was designed to cover agreements among foreign motor carriers.

The strongest support for defendants' position is found in the Report accompanying the final version of S. 1593. First, the Report states that the exemption section "extends a 'blanket' antitrust immunity to agreements of ocean common carriers, to agreements of marine terminal operators, to shippers' councils, to loyalty contracts, and to other activities regulated under the provisions of the bill." S.Rep. No. 97–414, 97th Cong., at 34 (1982). Then, after describing in detail the activities regulated under the bill that would receive antitrust immunity, the Report shifts to activities that, at least implicitly, were not regulated by the bill but would nonetheless receive immunity from antitrust prosecution:

In addition, transportation service within or between foreign countries, terminal services in foreign countries, as well as the activities of foreign shippers' councils are exempted from the antitrust laws. This is done in furtherance of the policy objective of the bill to harmonize U.S. shipping regulation more closely with that of our trading partners.

*Id.* This language appears to recognize immunities outside the scope of conduct otherwise regulated by the filing requirements of the Act. Moreover, defendants point out that the exclusion from antitrust liability of agreements among domestic inland carriers first appeared in the reported version of S. 1593. Defendants argue that the recognition in the Senate Report of immunity for non-ocean carrier agreements coupled with the explicit denial in S. 1593 of immunity for domestic motor carrier agreements together compel the conclusion that agreements of foreign inland carriers were intended to be immunized by the proposed Act.

The legislative history appears to favor defendant's position, although it does not conclusively resolve the issue at hand. Most notably, there is no discussion in the 98th Congress of the scope of the foreign inland segment immunity. Accordingly, the Court is left to draw inferences from earlier legislative history on previous unenacted versions of the bill. Certainly these inferences, even if on balance they favored the government's position, which they do not, would be insufficient to overcome the plain meaning of the Act.

c. *Conclusion: Scope of Section 7(a)(4)*

Section 7(a)(4) is not limited to agreements involving ocean common carriers. To hold otherwise would be to adopt a statutory interpretation that renders other provisions of

the Act meaningless. Most notably, Section 7(b)(1) which preserves antitrust liability for agreements among domestic motor carriers would have been entirely unnecessary if the Act's scope was limited to ocean carriers by Section 4. Furthermore, although the legislative history does not conclusively resolve the issue, it does tend to support the defendants' view that, in an effort to harmonize United States' practices with those of our trading partners, the Act provided immunities beyond those provided for under the regulatory filing scheme set up by the statute. The legislative history certainly does not provide a basis for reaching a result contrary to the plain meaning of the Act.

For the foregoing reasons, the Court holds that Section 7(a)(4) is not limited to agreements involving ocean common carriers. The statutory immunity is available for agreements among non-ocean common carriers so long as those agreements concern "the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade." 46 U.S.C.App. § 1706(a)(4).

## B. *The Luzon Defendants' Motion to Dismiss*

■■■■ The Luzon defendants seek dismissal of the indictment on the basis that the conduct charged in the indictment falls within Section 7(a)(4), and therefore cannot constitute a violation of antitrust law. The government counters that, even if Section 7(a)(4) applies to non-ocean carriers, it is not clear from the face of the indictment that the conduct alleged would fall within that exemption. As noted above, the Court may not consider evidence outside the face of the indictment in resolving defendants' motion. *See United States v. Jensen,* 93 F.3d 667, 669 (9th Cir.1996).

### 1. *Conduct Described in the Indictment*

Defendants contend that the conduct alleged in the indictment relates exclusively to the "foreign inland segment of through transportation," and, as such, falls squarely within the Section 7(a)(4) exemption from United States antitrust laws. The indictment alleges that

each corporate defendant engaged in the business of providing moving services in connection with the transportation of military shipments of household goods between the Philippines and the United States.

Indictment at 5:7–11. It further alleges that

the defendants and others entered into and engaged in a combination and conspiracy to suppress competition by fixing prices for moving services supplied in connection with the transportation of military shipments of household good between the Philippines and the United States.

*Id.* at 2:9–14. The indictment explains how transportation services were provided and alleges that the activities described in the indictment had a substantial effect on United States trade and commerce. *Id.* at 6:12—8:18. In explaining the jurisdictional nexus of the alleged offenses, the indictment describes the activities of "agents" as follows:

For outbound shipments to the United States, the agents accepted bookings on behalf of the U.S. freight forwarders they represented from U.S. military installations in the Philippines, packed the shipments, and transported the shipments by motor van to a port in the Philippines for transfer to an overseas carrier. For inbound shipments, the agents picked up the shipments at the port, transported the shipments by motor van to the final destination, and unloaded and unpacked the shipments.

*Id.* at 6:19—7:2. Thus, it appears from the face of the indictment that the conduct alleged—providing moving services between Philippine ports and military bases in the Philippines—occurred exclusively within the Philippines.

The government contends that the transportation described in the indictment is not necessarily "through transportation" within the meaning of the Act. The Act defines "through transportation" as

continuous transportation between origin and destination for which a through rate is assessed and which is offered or performed by one or more carriers, at least one of which is a common carrier, between a United States point or port and a foreign point or point.

46 U.S.C.App. § 1702(26). The Act defines "through rate" as "the single amount charged by a common carrier in connection with through transportation." 46 U.S.C.App. § 1702(25).

The government relies primarily on the language of Paragraph 2 of the indictment for its position that the indictment on its face is not limited to agreements concerning the foreign inland segment of through transportation. Paragraph 2 charges that

> the defendants and others entered into and engaged in a combination and conspiracy to suppress competition by fixing prices for moving services supplied in connection with the transportation of military shipments of household goods between the Philippines and the United States.

According to the government, this broad language could encompass agreements unrelated to through transportation.

Specifically, the government identifies two types of movements that would not constitute "continuous transportation" as required in the definition of "through transportation." First, the government presents the hypothetical situation in which United States freight forwarders arrange for the inland transportation in the United States and the Philippines, but the Department of Defense arranges separately and in its own name for the ocean segment of the transportation. Gov't Opp. at 17–18. According to the government, the indictment could be construed to include such an arrangement, and this arrangement could not be characterized as "through transportation."

The arrangement described in the indictment itself undermines the government's argument. According to indictment, the "Department of Defense contracts with U.S. freight forwarders for the transportation of military shipments of household goods between the Philippines and the United States." Indictment at ¶ 13. The indictment repeatedly alleges that the moving services provided by defendants were part of a "continuous and uninterrupted flow of United States foreign commerce." Indictment at ¶¶ 15,16,17,18,19. Furthermore, the indictment defines "military shipments of household goods" as "any shipment of furniture, personal effects or unaccompanied baggage owned by U.S. Department of Defense military or civilian employees and their families *that is transported between the Philippines and the United States under a Government Bill of Lading.*" Indictment at ¶ 7 (emphasis added). This reference to the International Through Government Bill of Lading (ITGBL) program establishes that the hypothetical arrangement in which the Department of Defense separately contracted for ocean carriage could not be encompassed by the indictment. *See* Def. Exh. 1, Decl. of Francis Galuzzo of DOD's Military Traffic Management Command (program is shipment to/from overseas under single Bill of Lading, and freight forwarders submit single bid which includes foreign inland carriers' rate). The repeated references to continuous and uninterrupted transportation as well as the obvious references to the ITGBL program compel the conclusion that the indictment alleges conduct that is part of "through transportation."

Second, the government argues that if the U.S. freight forwarder dealt with defendants as shippers rather than as connecting carriers, the transportation would not constitute "through transportation." The government relies on the definition provided in 46 U.S.C.App. § 1702(17) for the proposition that the freight forwarders may have dealt with defendants as shippers. Section 1702(17) provides that "non-vessel-operating common carrier" means "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper *in its relationship with an ocean common carrier.*" 46 U.S.C.App. § 1702(7) (emphasis added). This provision does not support the government's position. While a non-vessel-operating common carrier (NVOCC) may be a shipper in relation to the actual ocean common carrier, the freight forwarder remains a common carrier in its relationship to the Department of Defense. *See* 46 U.S.C.App. § 1702(6) (defining common carrier). There is simply no basis for reading into Section 1702(17) an assertion that the connecting carrier chain is broken simply because the freight forwarder is not the actual ocean carrier.

### 2. Conclusion: Dismissal of Indictment

The Court has concluded that Section 7(a)(4) exempts agreements among foreign motor carriers relating to the foreign inland segment of through transportation. The present indictment on its face alleges conduct occurring entirely within the Philippines and in relation to through transportation of military household goods under a single Bill of Lading. Because the indictment alleges conduct for which defendants are immune from criminal liability, the Court must grant defendants' motion to dismiss.[7]

 Even if the Court were unable to conclude whether Section 7(a)(4) exempted the type of agreements at issue in this case, the Court would still be required to grant defendants' motion. "In criminal prosecutions the rule of lenity requires that ambiguities in the statute be resolved in the defendant's favor." *United States v. Plaza Health Laboratories, Inc.*, 3 F.3d 643, 649 (2d Cir. 1993). "Where a criminal law is ambiguous," courts "are wary of imposing criminal liability for conduct that the law does not clearly prohibit." *United States v. Foster*, 133 F.3d 704, 708 (9th Cir.1998) (citing *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980)). The fact that the ambiguity is contained in a statutory exemption, rather than the statutory definition of the criminal conduct, does not preclude application of this rule. *See United States v. Sheek*, 990 F.2d 150 (4th Cir.1993) (applying rule of lenity in interpretation of the term "parent" in a statutory exemption to Federal Kidnapping Act). Thus, even if the Court had found that the Shipping Act exemption was ambiguous, the Court would resolve the ambiguity in defendants' favor and grant defendants' motion to dismiss the indictment.

### C. Tucor's Petition for Writ of Error Coram Nobis

 Tucor seeks a writ of error coram nobis to set aside its June 16, 1993 guilty plea. A corporation that has been sentenced only to a fine can employ a writ of error coram nobis to attack an unconstitutional conviction. *United States v. Mett*, 65 F.3d 1531, 1534 (9th Cir.1995). Although no longer operating as a corporation, Tucor remains a corporate entity with standing to pursue a writ of error coram nobis because it has not undergone corporate dissolution. *See Telink, Inc. v. United States*, 24 F.3d 42, 44–45 (9th Cir.1994). The government does not dispute that Tucor has standing to bring this petition.

Tucor attacks its conviction on several bases. First, Tucor argues that the indictment was defective because, in light of the Shipping Act exemption, the indictment failed to state an offense. Second, Tucor argues that its due process rights were violated by the government's failure to disclose the Shipping Act exemption to Tucor or to the Court. Third, Tucor argues that the government violated its Fifth Amendment rights by selectively prosecuting Tucor, but dismissing charges against Greek companies that had, according to Tucor, engaged in nearly identical conduct.

### 1. Sufficiency of the Indictment

Tucor argues that the indictment was deficient because it failed to raise the Shipping Act exemption and because the conduct alleged in the indictment does not amount to a crime.

#### a. Omission of Exemption

 The indictment contained no reference to the Shipping Act exemption which Tucor claims immunizes it from Sherman Act liability. "While an indictment must ordinarily charge every essential element of an offense, it need not negate every applicable statutory exception." *Echavarria–Olarte v. Reno*, 35 F.3d 395, 399 (9th Cir.1994), *cert. denied*, 514 U.S. 1090, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995); *see also United States v. Green*, 962 F.2d 938, 941 (9th Cir.1992) (government need not allege exception in the indictment); *United States v. Hester*, 719 F.2d 1041, 1042 (9th Cir.1983) (government not required to allege defendant's non-Indian status in indictment under the Federal En-

---

7. Because the Court grants defendants' motion to dismiss the indictment on the basis that the indictment alleges conduct that falls within the relevant Shipping Act exemption, it is not necessary to reach defendants' alternative argument that bilateral treaties between the United States and the Philippines also require dismissal of the indictment.

claves Act); *McKelvey, et al v. United States,* 260 U.S. 353, 357, 43 S.Ct. 132, 67 L.Ed. 301 (1922) ("By repeated decisions it has come to be a settled rule in this jurisdiction that an indictment ... founded on a general provision defining the elements of an offense ... need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it."). Therefore, the Court concludes that the Tucor indictment did not fail to state an offense simply because it did not raise and negate a potentially relevant statutory exemption to antitrust liability.[8]

### b. *Failure to State an Offense*

The Court has already concluded that the conduct alleged in the indictment does not amount to a crime. Nonetheless, the government argues that Tucor's guilty plea precludes Tucor from raising this attack on its conviction.

■■■■■ A defendant may attack a guilty plea by asserting jurisdictional claims that "the applicable statute is unconstitutional or that the indictment fails to state an offense." *United States v. Caperell,* 938 F.2d 975, 977 (9th Cir.1991) (quoting *United States v. Montilla,* 870 F.2d 549, 552 (9th Cir.1989)). In *Caperell,* the Ninth Circuit stated that:

> Although a guilty plea generally waives all claims of constitutional violation occurring before the plea, "jurisdictional" claims are an exception to this rule. In *Montilla,* we stated that, although the dividing line between constitutional claims waived by a plea of guilty and those that survive the plea is not always clear, "[c]laims that 'the applicable statute is unconstitutional or that the indictment fails to state an of-

fense' are jurisdictional claims not waived by the guilty plea."

*Caperell,* 938 F.2d at 977 (citations omitted). "[A] plea of guilty to a charge does not waive a claim that—judged on its face—the charge is one which the state may not constitutionally prosecute." *United States v. Broce,* 488 U.S. 563, 575–76, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). If the unconstitutionality is evident from the indictment and the record at the time of the guilty plea, then defendant may be entitled to attack the plea. *See United States v. Broce,* 488 U.S. 563, 575, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989).

*United States v. Caperell,* 938 F.2d 975 (9th Cir.1991), forecloses the argument that Tucor has waived its right to assert the insufficiency of the indictment. In *Caperell,* defendant pleaded guilty to engaging in a criminal enterprise relating to the manufacture, sale and possession of methamphetamine. *Id.* at 976. On appeal, defendant argued that the indictment failed to state an offense because methamphetamine was unlawfully included on the schedules of controlled substances. *Id.* at 977. The government argued that defendant had waived this defense by pleading guilty. The Ninth Circuit rejected the government's argument. The court emphasized that defendant's claim was "jurisdictional," and therefore reviewable, because it was capable of resolution by examining the indictment and the relevant statute. *Id.* at 977–78.

■■■■■ In the instant case, as in *Caperell,* defendant's attack on the sufficiency of the indictment can be resolved by reference to the indictment and relevant statutes. By pleading guilty, Tucor waived its right to contest the facts to which it admitted. *See United States v. Mathews,* 833 F.2d 161 (9th Cir.1987). However, Tucor did not waive its

---

**8.** *United States v. King,* 587 F.2d 956 (9th Cir. 1978), relied on by Tucor, does not compel a different conclusion. In *King,* a doctor was charged as a co-defendant in a conspiracy to possess cocaine with the intent to distribute. The indictment identified the doctor as a physician but did not allege that he distributed cocaine without a legitimate medical purpose. *Id.* at 963. The court held that the indictment failed to state an element of the offense and was therefore deficient. *Id.* The *King* decision was premised on the Ninth Circuit's earlier conclusion in

*United States v. Black,* 512 F.2d 864 (9th Cir. 1975), that the lack of authorization to dispense a controlled substance was an element of the crime charged. *King,* 587 F.2d at 963. In contrast, there is no support for the view that the inapplicability of the subject Shipping Act exemption is an element of the charges against Tucor that must appear in the indictment. Accordingly, the Court rejects Tucor's argument that *King* requires that the indictment raise and negate the relevant Shipping Act exemption.

right to assert that the conduct alleged in the indictment, accepted as true, does not constitute a crime. Since Tucor's claim can be resolved by reference to the face of the indictment and the applicable statute, Tucor can attack its conviction despite its guilty plea.

As discussed above, the Shipping Act exemption noted by Tucor removes Tucor's conduct from application of the antitrust laws of the United States. Thus, Tucor pleaded guilty to an indictment that did not allege criminal conduct. Had the Court been aware of this exemption at the time of Tucor's change of plea hearing, the Court would certainly not have accepted a guilty plea. Having now become aware of this exemption, the Court must allow Tucor to attack its conviction. Because Tucor is not in custody, it properly petitions for a writ of error coram nobis as the vehicle for obtaining relief. For the foregoing reasons, the Court will grant Tucor's petition.

### 2. *Failure to Disclose*

 Tucor sets forth compelling evidence that counsel for the government knew of the statutory exemption when it entered into the plea agreement with Tucor. According to Tucor, at the time of the indictment in the instant case, the government was investigating similar conduct by companies involved in the transportation of military household goods from bases in Greece. On February 9, 1993, the attorney for Interdean, one of the Greek moving companies under suspicion, met with counsel for the government, including Reginald Tom, concerning the Grand Jury proceedings in that matter. Defendant's Exh. 1, Decl. of Warren L. Dean, Jr. at ¶ 2. At this meeting, Interdean's attorney, Warren Dean, alerted counsel for the government that Interdean considered itself immune from antitrust liability by virtue of Section 7 of the Shipping Act of 1994. *Id.* at ¶ 3. The government attorneys at the meeting allegedly asked Dean to provide a written analysis of the applicability of the Shipping Act's antitrust immunity provisions. *Id.* at ¶ 5. Dean provided this written analysis to Tom, counsel for the government, on February 17, 1993. Thus, counsel for the government was aware of the Shipping Act exemptions in February, 1993, approximately four months before Tucor entered into the subject plea agreement. Nonetheless, counsel for the government did not disclose to the defendant or the Court that there was a potentially relevant exemption from antitrust liability in the Shipping Act of 1984.

Tucor argues that by this omission, the government violated its *Brady* obligations and violated its duty of candor to the Court. In *Brady v. State of Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." This obligation by its own terms reaches "evidence." The focus of the obligation is on providing defendants access to exculpatory evidence to which they otherwise would not have access. *See generally United States v. Bracy,* 67 F.3d 1421, 1428–29 (9th Cir.1995). This logic does not apply to published legal authority, particularly where defendant is represented by counsel who undoubtedly had access to the materials in question. Accordingly, the Court finds that Tucor's *Brady* claim is without merit.

 Tucor also contends that the government breached its duty of candor to the Court by not raising the exemption issue during the June 16, 1993 plea hearing. As pointed out by Tucor, attorneys have a "continuing duty to inform the court of any development which may conceivably affect the outcome of the litigation." *Bd. of License Commissioners of Tiverton v. Pastore,* 469 U.S. 238, 240, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985) (quoting *Fusari v. Steinberg,* 419 U.S. 379, 381, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring)). Furthermore, an United States Attorney has an even greater obligation than a private litigant to see that justice is done. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The government denies that it had concluded prior to entering into the plea agreement that Section 7(a)(4) immunized Tucor's conduct. *See* Opp. at 12:24–26; *See also* Decl. of Reginald K. Tom (Department at no time concluded exemption applied to defen-

dant). The government's supplemental briefing contains a defensible, although, in the Court's opinion, incorrect, interpretation of the scope of the Shipping Act immunities. Under these circumstances, the Court finds that the government has rebutted Tucor's contention that the government considered Tucor's conduct immunized when it entered into the plea agreement.

The fact that the government had not concluded at the time of Tucor's plea that Section 7(a)(4) immunized Tucor from prosecution does not mean that the government fulfilled its duty of candor to the Court. Rather than bring to the attention of the Court a statutory provision that, on its face, appeared to immunize Tucor from prosecution, the government, by its silence in the plea proceedings, prevented this issue from being resolved prior to the Court's acceptance of the plea and imposition of sanctions. Even if the government's interpretation of the statute were correct, the government's failure to bring this potentially applicable immunity to the attention of the Court is hard to understand, particularly in light of the Court's conclusion in this case that the conduct at issue does not violate federal law, and, in the Court's view, represents a far too restrictive view of prosecutorial obligations.

### 3. *Selective Prosecution*

█ As a final basis for setting aside its guilty plea, Tucor argues that the government selectively prosecuted the defendants in this case. Tucor notes that the government decided not to prosecute the Greek defendants after learning of the statutory exemption, but continued to prosecute the Philippine defendants. According to Tucor, its nationality was the only possible basis for the government's decision, since there was "no factual distinction" between the acts of the Greek companies and those of Tucor and its co-defendants. Def. Pet. at 21.

Tucor cannot maintain a selective prosecution claim because any such claim was foreclosed once Tucor plead guilty. *See United States v. Aguilar*, 883 F.2d 662, 705 n. 44 (9th Cir.1989) (defense of selective prosecution is deemed waived if not raised prior to trial); *United States v. Oaks*, 508 F.2d 1403, 1404 (9th Cir.1974). Tucor argues that the selective prosecution claim did not ripen until after defendant had entered its plea. Specifically, Tucor learned of the decision not to prosecute the Greek defendants on December 1, 1993, over five months after judgment was entered pursuant to the plea agreement. While these facts may suggest that there was no "waiver" of the selective prosecution in a technical sense, Tucor's guilty plea still forecloses independent inquiry into its selective prosecution claim. *See Broce*, 488 U.S. at 573, 109 S.Ct. 757 (conscious waiver not necessary with respect to each potential defense relinquished by a guilty plea); *Cf. Tollett v. Henderson*, 411 U.S. 258, 266, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (guilty plea foreclosed defendant's challenge to selection of Grand Jury even though technically no "waiver" because defendant had not known of discriminatory jury selection until after plea).

█ Even if Tucor's selective prosecution claim could survive its guilty plea, Tucor's evidence would be insufficient to support such a claim. To establish a claim of selective prosecution, the defendant must show that the prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). A defendant must show not only that similarly situated defendants were not prosecuted, but also that the prosecution was deliberately based on classifications protected under the Equal Protection Clause. *Id.* at 608–10, 105 S.Ct. 1524. Other than conclusorily asserting that the government based its prosecutorial decision on nationality, Tucor has failed to make a showing that the government's decision to prosecute Philippine, but not Greek, moving companies was impermissible. Any number of factors could have been involved in the government's decision not to prosecute the Greek companies that were under investigation.

### 4. *Conclusion: Coram Nobis Relief*

Tucor has set forth a number of arguments in support of its petition for a writ of error coram nobis. The Court will grant Tucor's petition because the conduct alleged in the indictment to which Tucor pleaded guilty does not amount to a criminal offense.

### III. CONCLUSION

For the foregoing reasons, the Court hereby:

(1) GRANTS defendant Tucor's petition for a writ of error coram nobis;

(2) VACATES the Judgment entered on June 22, 1993, and amended on June 25, 1993; and

(3) GRANTS the Luzon defendants' motion to dismiss the indictment.

IT IS SO ORDERED.