**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**TUCOR INTERNATIONAL, INC.; Tucor Industries, Inc., dba Tucor Moving & Storage Corporation; Luzon Moving & Storage Corporation; George Schulze, Sr.; George Schulze, Jr., Defendants–Appellants.**

No. 00–10167.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 13, 2000

Filed Jan. 25, 2001

Warren L. Dean, Jr., Washington, D.C., James R. Wyrsch, Wyrsch, Hobbs & Mirakian, P.C., Kansas City, MO, for the defendants-appellants.

John J. Powers, III, Antitrust Division, U.S. Department of Justice, Washington, D.C., for the plaintiff-appellee.

Before: THOMPSON, O'SCANNLAIN, and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

Appellants are motor carriers and their officers who were prosecuted for antitrust violations but were ultimately exonerated, because their conduct was found to be covered by an antitrust immunity provision of the Shipping Act of 1984, 46 App. U.S.C. §§ 1701–1719. Appellants then moved for attorney's fees and costs under the Hyde Amendment. Pub. L. No. 105–119, Title VI, § 617, 111 Stat. 2519 (1997), *reprinted in* 18 U.S.C. § 3006A (historical and statutory notes). The district court denied the motion. We have jurisdiction of this timely appeal under 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

### A. Factual Background and Prior Proceedings

When American military personnel serving abroad are relocated to the United States, the government makes arrangements for the shipping of their belongings. The government contracts for "through transportation," which means that the belongings are transported under a single bill of lading from their point of origin to their final destination, although transportation along different segments of the route is often provided by different carriers using different modes of carriage.

Appellants are engaged in the business of motor transportation within the Philippines. As part of the through transportation of the belongings of American military personnel returning from the Philippines, Appellants trucked the belongings from Subic Bay Naval Base and Clark Air Force Base to a Philippine seaport, where the belongings were loaded onto vessels bound for the United States. Appellants were indicted on September 9, 1992, for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix prices.

Appellant Tucor Industries, Inc. is a Philippine corporation. Pursuant to a plea agreement, Tucor pleaded guilty to the Sherman Act charge and was fined $121,800. Judgment was entered on June 22, 1993. In 1997, Tucor filed a petition for a writ of error coram nobis, seeking to have the judgment vacated.

Appellants Luzon Moving and Storage Corp. and Philippine–American Moving and Storage Corp. (PAMSC) are Philippine corporations. Appellants George Schulze, Sr., and George Schulze, Jr., are officers and shareholders of Luzon and PAMSC. These Appellants never appeared before the district court for arraignment, but in 1997 they made a special appearance in order to move to dismiss the indictment.

The district court granted the petition for writ of error coram nobis, vacated the judgment against Tucor, and granted the motion to dismiss the indictment of Luzon, PAMSC, and the Schulzes. *United States v. Tucor Int'l, Inc.,* 35 F.Supp.2d 1172, 1189 (N.D.Cal.1998) (*Tucor I*), *aff'd,* 189 F.3d 834 (9th Cir.1999). The court held that because Appellants provided ground transportation solely within the Philippines, those activities were immunized against antitrust liability by Section 7(a)(4) of the Shipping Act of 1984, 46 App.U.S.C. § 1706(a)(4) (providing that "[t]he antitrust laws do not apply to ... any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade"). *Id.* at 1182–83. We affirmed. *United States v. Tucor Int'l Inc.,* 189 F.3d 834, 838 (9th Cir.1999) (*Tucor II*).

Both in the district court and on appeal, the government argued unsuccessfully that the Shipping Act's antitrust immunities did not apply to Appellants because the immunities should be limited to entities that are "ocean common carriers," as that term is defined in Section 3 of the Shipping Act, 46 U.S.C. app. § 1702(6), (16). Appellants are concededly not ocean common carriers, but both *Tucor I* and *Tucor II* held that the relevant exemption is not limited to ocean common carriers.

Appellants next brought a motion in the district court for attorney's fees and costs under the Hyde Amendment, which provides that a court may award fees and costs to a prevailing criminal defendant if the court "finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust." 18 U.S.C. § 3006A (historical and statutory notes). The district court denied the motion, finding both that the government had a good-faith but erroneous belief in the correctness of its interpretation of the Shipping Act and that the government's interpretation was not so clearly contrary to the statutory language as to render the prosecution vexatious or frivolous. This timely appeal followed.

## B. The Greek Case

Some of Appellants' arguments are based on what they refer to as "the Greek case," a separate antitrust investigation that was taking place at the same time that Appellants were being prosecuted. When Hellenikon Air Force Base in Greece was closed in 1990, the government arranged for through transportation of the belongings of returning Hellenikon personnel, just as it did for personnel returning from the Philippines. The Department of Justice conducted an investigation of potential antitrust violations in Greece that paralleled those alleged in Appellants' case—agreements among carriers handling the foreign inland segment of through transportation. On February 9, 1993, Warren L. Dean, Jr., an attorney for one of the Greek inland carriers under investigation, met with counsel for the government and argued that Section 7 immunized his client's activities against antitrust liability. Dean provided the government with a written analysis to the same effect on February 17, 1993.

The Department of Justice was thus made aware of the relevance of the Shipping Act's antitrust exemptions four months before Tucor's plea hearing, but it did not disclose the potential applicability of those provisions to the district court or to Tucor. On December 1, 1993, the government decided not to prosecute the Greek carriers. Appellants infer from this that the government agreed with Dean's interpretation of the Shipping Act, recognized that the Greek carriers were immune, and thus also recognized that Appellants were immune. In *Tucor I*, the district court largely rejected these arguments, finding (1) that "the government had not concluded at the time of Tucor's plea that Section 7(a)(4) immunized Tucor from prosecution," (2) that Tucor had failed to prove selective prosecution, but (3) that the government had probably violated its duty of candor to the court by failing to bring the immunity provisions to the court's attention. *Tucor I*, 35 F.Supp.2d at 1188.

## II. STANDARD OF REVIEW

A district court's denial of a motion for attorney's fees under the Hyde Amendment is reviewed for abuse of discretion. *United States v. Lindberg*, 220 F.3d 1120, 1124 (9th Cir.2000). Under that standard, this court cannot reverse unless it has a definite and firm conviction that the district court committed a clear error of judgment. *Id.* The district court abuses its discretion when it makes an error of law, *Koon v. United States*, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), or bases its conclusion on a clearly erroneous finding of fact, *Paradis v. Arave*, 130 F.3d 385, 390 (9th Cir.1997).

## III. DISCUSSION

To a large extent, Appellants' arguments hinge on the reasonableness of the government's now-discredited theory that the Shipping Act's antitrust immunity provisions do not apply to Appellants. Appellants also contend that that theory contradicts the position successfully advocated by the government in an earlier case, *Transpacific Westbound Rate Agreement v. Federal Maritime Commission*, 951 F.2d 950 (9th Cir.1991), thus conflicting with both binding precedent and the government's prior interpretation of the Act. We analyze these broad issues first, before turning to Appellants' other, narrower arguments.

### A. The Shipping Act and Appellee's Interpretation of the Antitrust Immunities

Section 3 of the Shipping Act defines "common carrier" as follows:

"[C]ommon carrier" means a person holding itself out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for compensation that—

(A) assumes responsibility for the transportation from the port or point

of receipt to the port or point of destination, and

(B) utilizes, for all or part of that transportation, a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country....

46 App.U.S.C. § 1702(6). "Person" is defined to include "individuals, corporations, partnerships," and other associations recognized by law. *Id.* § 1702(18). An "ocean common carrier" is defined as a "vessel-operating common carrier." *Id.* § 1702(16).

Section 4 of the Act, entitled "Agreements within scope of chapter," provides that the Act applies to "agreements by or among ocean common carriers" regarding certain specified activities, and also to a narrower range of "agreements among marine terminal operators." *Id.* § 1703(a), (b). Section 5 then provides that a true copy of any agreement covered by Section 4 must be filed with the Federal Maritime Commission (FMC), but Section 5 also creates an exception to the filing requirement for "agreements related to transportation to be performed within or between foreign countries and agreements among common carriers to establish, operate, or maintain a marine terminal in the United States." *Id.* § 1704(a).

Section 7 then lists certain agreements and activities to which "[t]he antitrust laws do not apply." *Id.* § 1706(a). In particular, Sections 7(a)(1) and 7(a)(2) essentially immunize all agreements filed under Section 5. *Id.* § 1706(a)(1)-(2). Section 7(a)(4), which in *Tucor II* was held to apply to Appellants' conduct, immunizes "any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade." *Id.* § 1706(a)(4). Section 7(a)(4) does not make any explicit reference to common carriers or to ocean common carriers. Also, it deals only with foreign-to-foreign transportation ("the foreign inland segment of through transportation"), whereas the Act defines "common carrier" in terms

of transportation between the United States and a foreign country.

These considerations tend to make the government's position in *Tucor I* and *Tucor II*, namely, that the grant of immunity in Section 7(a)(4) applies only to ocean common carriers, look unreasonable. But the government's position gains at least some measure of reasonableness when it is understood in terms of the following general underlying premise: According to the government, the antitrust immunities granted by the Shipping Act were intended to be limited to the entities, activities, and agreements that are brought within the FMC's regulatory jurisdiction by the Act. In essence, the point of Section 7(a)(4), according to the government, is to immunize agreements (and consequent activities) that are within the scope of the Act under Section 4 but that fall within Section 5(a)'s exception for foreign-to-foreign agreements among ocean common carriers. Because such agreements are not required to be filed under Section 5(a), they are not immunized by Sections 7(a)(1) and 7(a)(2). The purpose of Section 7(a)(4), according to the government, is to fill part of that gap, but as a result it is limited to agreements (and consequent activities) among ocean common carriers.

These considerations do not, of course, entirely resolve the tensions between the statutory text and the position that the government advocated, and its interpretation of Section 7(a)(4) was ultimately rejected by this court in *Tucor II*. But placed in the context of the government's understanding of the interplay between the regulatory scope of the Shipping Act and the antitrust immunities that the Act provides, the government's interpretation of Section 7(a)(4) does not seem nearly as contrary to the plain meaning of the statute as it might appear on first look. Other than repeatedly asserting that the government's position is obviously at odds with the statutory text, Appellants have presented no arguments to show that the district court abused its discretion in finding that that

position "was not so obviously wrong as to be frivolous."

### B. *Transpacific*

In 1987, the FMC proposed a rule that would have allowed voluntary filing of agreements that are not subject to the filing requirement of Section 5(a). 52 Fed. Reg. 46,501 (proposed Dec. 8, 1987). Under the proposed rule, such voluntarily filed agreements would thereby be brought within the Section 7(a)(1)–(2) antitrust immunity for filed agreements. *Id.*

After receiving comments from various parties, including vigorous opposition from the Department of Justice, the FMC withdrew the proposed rule. The FMC reasoned that an entity is a common carrier only insofar as it provides transportation services between the United States and a foreign country—when such a carrier provides foreign-to-foreign transportation services, it does not, as regards those services, qualify as a common carrier under the Act. Thus, agreements concerning foreign-to-foreign transportation are not agreements within the scope of the Act under Section 4, because they are not agreements among common carriers (i.e., for purposes of those agreements, the parties are not acting as common carriers). *See Transpacific*, 951 F.2d at 953. On this basis, the FMC issued an order in which it held that it had jurisdiction only over agreements concerning transportation between the United States and a foreign country. The order rejected the concept of voluntary filing and stated that an agreement that concerned both regulated and unregulated activity (a "mixed agreement") could no longer be filed in its entirety. Thus, only those portions of a mixed agreement that concerned United States—to-foreign transportation could be filed and thereby brought within the antitrust immunity provisions of Section 7(a)(1)–(2). *See Transpacific*, 951 F.2d at 952.

The Transpacific Westbound Rate Agreement, an association of ocean common carriers, challenged the FMC's order. Transpacific argued that the FMC did have jurisdiction over the foreign-to-foreign portions of mixed agreements and, in the alternative, defended the concept of voluntary filing. *Transpacific*, 951 F.2d at 952. The Department of Justice and the FMC jointly filed a brief in support of the order. This court found no error in the FMC's interpretation of the Shipping Act and upheld the FMC's order. *Transpacific*, 951 F.2d at 957.

Appellants now argue that the government's position in *Transpacific* conflicts with the government's position in the Tucor prosecution, for the following reasons: In *Transpacific*, the government defended the FMC's position that an entity qualifies as a common carrier only insofar as it engages in United States—to-foreign transportation. Section 7(a)(4), the antitrust immunity provision at issue in the Tucor prosecution, concerns only foreign-to-foreign transportation. Therefore, under the reasoning successfully advocated by the government in *Transpacific*, Section 7(a)(4) cannot apply to common carriers. But the government contended throughout the Tucor prosecution that Section 7(a)(4) applies to common carriers and to no one else.

This argument amounts to nothing more than a terminological confusion. The government's position in the Tucor prosecution was that the immunity provisions in Section 7 apply only to entities that engage in some common carrier activity, that is, to entities that do qualify as common carriers for at least some of the transportation services that they provide. On this reading, Section 7(a)(4) immunizes any agreements among such entities that concern foreign-to-foreign transportation. It is true that, under the reasoning of *Transpacific*, those entities are not common carriers *for purposes of those agreements*. But the government's position in the Tucor prosecution was simply that those entities would not be eligible for the Section 7(a)(4) immunity if they were not common carriers for purposes of some other transportation services that they provide.

There is no substantive conflict between that position and the position successfully advocated by the government in *Transpacific*. At most, Appellants' argument shows that the government should have used the term "common carrier" more carefully in describing its position in the Tucor prosecution. Instead of saying that Section 7(a)(4) applies only to ocean common carriers, the government should have said that Section 7(a)(4) applies only to entities that engage in some activity that qualifies them as ocean common carriers with respect to that activity, although the activity that makes them ocean common carriers is not itself immunized by Section 7(a)(4).

Moreover, some of the reasoning of *Transpacific* actually supports the underlying premise of the government's position in the Tucor prosecution, namely, that the scope of the antitrust immunities granted by the Act should be tied to the regulatory jurisdiction conferred on the FMC by the Act. In *Transpacific*, we reasoned that because the Act describes the FMC's regulatory powers as limited to common carriers, it is unlikely that the Act was meant to confer antitrust immunity on any entities that are not common carriers. *See* 951 F.2d at 954. "It does not seem logical that Congress intended to confer antitrust immunity on parties largely outside of the regulatory power of the FMC...." *Id.* In this way, the reasoning of *Transpacific* actually embraces, rather than conflicts with, the position advocated by the government in the Tucor prosecution. *Transpacific* thus makes the government's position in the Tucor prosecution look more plausible than it otherwise would; it does not undermine it.

For all of these reasons, we reject Appellants' argument that the government's position in the Tucor prosecution was contrary to the position successfully advocated by the government in *Transpacific*.

## C. Appellants' Remaining Arguments

### 1. Failure to Apply the Terms of the Hyde Amendment Disjunctively

 Under the Hyde Amendment, a court may award fees and costs to a prevailing criminal defendant if the court "finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust." 18 U.S.C. § 3006A (historical and statutory notes). The plain meaning of the text indicates that the test is disjunctive—satisfaction of any one of the three criteria (vexatiousness, frivolousness, or bad faith) should suffice by itself to justify an award. Appellants argue that the district court failed to apply the test in this way, instead holding Appellants to a single "generalized burden of proof."

The argument is without merit. The district court engaged in a detailed analysis of the text of the Hyde Amendment, including separate definitions of the terms "vexatious," "frivolous," and "bad faith." The district court stated that it had already found, in *Tucor I*, that "the government honestly believed at the plea hearing that the conduct in the Indictment was prohibited by law and did not fall within the immunity clauses of the Shipping Act." That factual finding negates bad faith. The district court further concluded that "the legal position taken by the government was a defensible one in a first impression circumstance." That conclusion is sufficient to establish that the prosecution was neither vexatious nor frivolous, on any understanding of those terms.[1] For

---

1. There is no Ninth Circuit case law on the Hyde Amendment that spells out precisely what the terms "vexatious," "frivolous," and "bad faith" mean. The court in *Lindberg* noted this lacuna but saw no need to fill it, because on any plausible interpretation of those terms, the district court in that case had not abused its discretion. *Lindberg*, 220 F.3d at 1125 (citing cases from the Fourth and Eleventh Circuits that have analyzed the terms, but declining to reach the issue). The instant case is similar.

all of these reasons, Appellants' argument fails.

### 2. Failure to Treat the Statute as "Binding Precedent"

■ Appellants argue that the district court erred by "requir[ing] that the prosecution be foreclosed by binding judge-made law," rather than treating the "clear and unambiguous statutory language" of the Shipping Act as "binding precedent." The argument is without merit. As the district court explicitly stated, "The Court is satisfied that the legal position taken by the government in this case was not foreclosed by binding precedent *and that it was not so obviously wrong as to be frivolous.*" (emphasis added) (citation omitted). The emphasized portion indicates that the court did consider the reasonableness of the government's position independently of the absence of contrary case law. The district court did not ignore the statutory language—it just found the statute to be somewhat less clear and unambiguous than Appellants claim it is. Analyses of both the statute and the government's interpretation of it indicate that the district court did not abuse its discretion in so finding. *See* Part III.A, *supra.*

### 3. The Government's Allegedly Unethical Conduct

■ Appellants argue (1) that the government learned of the applicability of Section 7(a)(4) through its investigation of the Greek case, (2) that the government intentionally violated its ethical duties by withholding this exculpatory information from both Appellants and the district court, and (3) that the district court erred by failing to find that such intentional unethical behavior was vexatious, frivolous, or in bad

faith. We are unpersuaded by Appellants' argument.

The district court found in *Tucor I* and reaffirmed in this case that "the government honestly believed at the plea hearing that the conduct in the Indictment was prohibited by law and did not fall within the immunity clauses of the Shipping Act." (citing *Tucor I*). In *Tucor I*, the district court based this finding of fact on the declaration of a Department of Justice attorney who was involved in both the Greek case and the Tucor prosecution. *See Tucor I*, 35 F.Supp.2d at 1187–88. The district court was fully aware of the circumstances of the Greek case. *See id.* at 1187. The court was under no obligation to conclude that the government's reason for not prosecuting the Greek carriers was that the government believed that Section 7 barred such prosecution, and the court explicitly declined to draw any such inference. *Id.* at 1188 ("Any number of factors could have been involved in the government's decision not to prosecute the Greek companies that were under investigation."). In effect, Appellants' argument merely repeats the facts of the Greek case and asks this court to make factual findings contrary to those made by the district court. Appellants have given us no reason to conclude that the district court's findings were clearly erroneous.

■ Because the government honestly believed that the Section 7 immunities did not apply in the Tucor prosecution, the decision to prosecute was not in bad faith. In addition, Appellants have failed to explain how the government's failure to disclose legal authority that the government believed to be irrelevant could make the decision to prosecute vexatious or frivolous.[2] Appellants have not shown that the

---

**2.** Appellants attempt to characterize the government's conduct as akin to a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but this argument is without merit. *Brady* held that prosecutors have a constitutional duty to disclose exculpatory evidence to criminal defendants. *See id.* at 87, 83 S.Ct. 1194. Appellants have cited no authority for the proposition that

prosecutors are under any duty, legal or ethical, to disclose relevant legal authority to criminal defendants, and we are aware of none. Prosecutors, like all lawyers, have an ethical duty to disclose relevant legal authority to the court, but that has nothing to do with *Brady. See, e.g.,* Model Rules of Prof'l Conduct R. 3.3 (1995).

government's interpretation of the Shipping Act was so unreasonable as to deprive the government of probable cause to prosecute. Nor could a finding of vexatiousness or frivolousness be based on the claim that this court had already ruled against the government's position, because the result and the reasoning of *Transpacific* were in fact consistent with, and at least partially supportive of, the government's position in the Tucor prosecution.

Nonetheless, there remains the district court's suggestion in *Tucor I* that the government's failure to inform the court about the Section 7 immunities might constitute an ethical violation. *See Tucor I*, 35 F.Supp.2d at 1188 (noting that the government's failure to inform the court about the immunities "represents a far too restrictive view of prosecutorial obligations"). But in ruling on the Hyde Amendment motion, the district court explained that its remarks in *Tucor I* were meant only "as an assessment of faulty judgment by the government," not as an indication that the government's conduct "was intended to defraud the Court." On any plausible interpretation of the Hyde Amendment standard, mere "faulty judgment" is not vexatious, frivolous, or in bad faith. Appellants have not shown that the district court's finding of "faulty judgment," as opposed to intentional fraud, was an abuse of discretion.

### 4. Different Interpretations of the Indictment

In opposing Appellants' motion for fees and costs before the district court, the government argued that its interpretation of the indictment was broader than the district court's and the Ninth Circuit's, and that the government consequently believed that the indictment related in part to conduct that was not considered by the courts and that was clearly not protected by the Section 7 immunity provisions. The government offered this argument to negate bad faith, and the district court appears to have approved of the argument to some extent. Appellants argue that this was

error. We need not, however, and do not decide the merits of this contention.

The government's argument regarding its interpretation of the indictment related only to bad faith, and that is how the district court treated it. But lack of bad faith is already established by the district court's finding that the government honestly believed that the Section 7 immunities did not apply to Appellants. Appellants' attack on the government's other argument regarding bad faith does not undermine that conclusion.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the district court did not abuse its discretion in finding that the position of the United States was not vexatious, frivolous, or in bad faith. The decision of the district court is therefore

**AFFIRMED.**