UNITED STATES of America,

v.

GOSSELIN WORLD WIDE MOVING N.V. and The Pasha Group, Defendants.

No. 1:03cr551 (GBL).

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 16, 2004.

**498**

Hays Gorey, Jr. Daniel L. Zelenko, Esquire, Mark W. Pletcher, Craig Y. Lee, Esquire, United States Department of Justice, Antitrust Division, Washington, DC, for Plaintiff.

Henry W. Asbill, William B. Moffitt, L. Barreett Boss, Cozen O'Coneor, C. Allen Foster, John F. Scalia, Greenberg Traurig, Charles F. Rule, Anthony V. Nanni, Abram J.Pafford, Franklin M. Rubinstein, Tommy P. Braudreau, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for Defense.

### MEMORANDUM OPINION

LEE, District Judge.

THIS MATTER is before the Court on Defendant Gosselin World Wide Moving N.V.'s ("Gosselin") Motion to Dismiss the Information for Failure to State an Offense, and Defendant Pasha Group's ("Pasha") Motion to Dismiss Criminal Information. This is a criminal case, which arises out of Defendants' alleged antitrust violations. The Government alleges that Defendants violated 15 U.S.C. § 1, conspiracy to restrain trade (Count I), and 18 U.S.C. § 371, conspiracy to defraud the United States (Count II). Both Gosselin and Pasha have entered into a plea agreement with the Government, conditioned upon the outcome of the Court's ruling on these motions.

Five issues exist before this Court. First, whether Defendants alleged conduct falls within an exception to the antitrust laws as specified in Section 1706(a)(4) (codified at 46 U.S.C. app. § 1706(a)(4)) of the Shipping Act of 1984 ("Shipping Act"). Second, whether the language of Section 1706(a)(4) of the Shipping Act is so ambiguous as to warrant the Court's application of the rule of lenity, mandating dismissal of the criminal information. Third, independent of the issues raised by Section 1706(a)(4) of the Shipping Act, does Section 7(a)(2) (codified at 46 U.S.C. app. § 1706(a)(2)) of the Shipping Act further exempt Defendants' conduct from the antitrust laws. Fourth, if the Court finds that antitrust immunity does not apply to Defendants in this case, whether Section

7(c)(1)(codified at 46 U.S.C. app. § 1706(c)(1)) of the Shipping Act provides Defendants retroactive immunity. Fifth, does the Government state an independent basis for fraud independent of the Sherman Act violation.

The Court holds that under a plain reading of Section 1706(a)(4) of the Shipping Act, Defendants' activity does "concern" the foreign inland segment of through transportation. As such, Defendants alleged conduct is not within the purview of the antitrust laws pursuant to the Shipping Act's antitrust immunity provisions.

Second, even assuming *arguendo,* that Defendants alleged conduct was not immune from the antitrust laws under a plain reading of Section 1706(a)(4), the Court holds that as a matter of law, the statutory and common law rules of lenity mandate dismissal of the pending criminal information.

Third, the Court holds that, independent of antitrust immunity Defendants enjoy pursuant to a plain reading of Section 1706(a)(4) of the Shipping Act, Defendants shipping activity involving military household goods is exempt from the Federal Maritime Commission's tariff filing and publication requirements, and thus is immunized from antitrust scrutiny under Section 1706(a)(2) of the Shipping Act.

Fourth, the Court holds that under Section 7(c)(1) of the Shipping Act (codified at 46 U.S.C. app. § 1706(c)(1)), Defendants are entitled to retroactive immunity under the Shipping Act. However, this argument is moot because the Court finds that Defendants have immunity under a plain reading of Section 1706(a)(4), and alternatively under the statutory and common law rules of lenity.

Fifth, the Court holds that the Government states a basis for fraud against Defendants, independent of the Sherman Act violations. Where the same conduct violates two different criminal statutes, the Government can prosecute and punish it under both statutes, as long as each statutory provision requires proof of a fact which the other does not.

Therefore, the Court holds that Defendant Gosselin's Motion to Dismiss the Information for Failure to State an Offense is PARTIALLY GRANTED, and Defendant Pasha's Motion to Dismiss Criminal Information is PARTIALLY GRANTED. The Court DISMISSES Count One of the Criminal Information.

## BACKGROUND

### Basic Facts

This case arises out of an alleged antitrust "price-fixing" case that the Government has brought against two companies, Gosselin, a Belgian company headquartered in Antwerp, Belgium, and Pasha, a United States company headquartered in Corte Madera, California. Count I of the Indictment alleges conspiracy to restrain trade in violation of Title 15, United States Code, Section 1. Count II of the Indictment alleges conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371.

Gosselin and Pasha are both in the business of shipping the household goods of U.S. military personnel from their European homes to foreign ports. In November 2003, Gosselin and its Managing Director Marc Smet were indicted for violating the Sherman Act and conspiring to defraud the United States. The Government has since dismissed the Indictment against Mr. Smet. The November 2003 Indictment was superceded by a Criminal Information, which the Government filed on February 13, 2004. The Criminal Information charged Gosselin and its alleged co-conspirator, Pasha. Defendants entered a conditional plea of guilty to the Criminal

Information, in which they expressly reserved the right to file this motion to dismiss.

*The International Through Government Bill of Lading Program*

The alleged price fixing conspiracy revolves around the International Through Government Bill of Lading ("ITGBL") program. The Department of Defense ("DOD") pays for this program, whose purpose is to transport military and civilian personnel household goods to and from foreign countries. The ITGBL is administered by the Military Traffic Management Command ("MTMC"). MTMC solicits bids from U.S. freight forwarders (also called carriers). Freight forwarders are the companies that shoulder the ultimate responsibility for the military household goods shipment between the U.S. and foreign countries. *See* Statement of Facts at 5.

Freight forwarders subcontract with other service providers for each component of the transportation. The other service providers are (1) local foreign moving and storage companies, (2) foreign port agents, (3) ocean carriers, (4) U.S. port agents, and (5) U.S. moving and storage companies. Criminal Information ¶ 10; Statement of Facts ¶ 7. Freight forwarders obtain rate commitments from the service providers for each of the components, add their own markup, and combine these bids into what is called a "through rate." In putting together their through rates, U.S. freight forwarders must consider the costs for each of these services, plus the costs of a booking agent to monitor shipments, physical inputs, such as liftvans and warehouses, and finally, overhead and profit. The through rate is then submitted to the MTMC.

The MTMC conducts bidding twice a year for six-month cycles in a two-step bidding process. *See* Statement of Facts ¶¶ 4, 13. In the first step, or "initial filing," U.S. freight forwarders file their "through rates" in each route—called a "channel." [1] The lowest bidder in the initial filing sets what is called the "prime rate." The carrier that sets the prime rate for a channel is guaranteed a predetermined percentage of the shipments for that particular channel. A carrier may instead file an "administrative high" rate to indicate its intent not to file competitively at the initial filing stage, while reserving the right to file again at the second stage, known as the "me-too" stage. *See* Statement of Facts ¶ 15.

After the initial filing, MTMC publishes a list of the lowest five bids received by MTMC for each channel. Statement of Facts ¶ 16. During the "me-too" bidding period, carriers that did not set the "prime rate" may match, or "me-too" the lowest rate and receive a guaranteed fraction of the shipments moved on that particular channel. *Id.* Alternatively, carriers can file a rate higher than the low rate; however, MTMC will ship household goods using carriers with higher filed rates only after all carriers with lower rates on file exhaust their capacity.

Gosselin and Pasha have two roles within the ITGBL program. First, Pasha and Gosselin act as exclusive co-agents of an association of freight forwarders called the International Shippers' Association ("ISA"). Statement of Facts ¶ 10. Pasha and Gosselin negotiate a "service contract" on behalf of ISA with the Trans Atlantic American Flag Line Operators ("TAAFLO"), an immunized conference of U.S.

---

1. Each "channel" is a route to or from a particular state and a specific foreign country. For instance, a channel originating from a U.S. military base in Germany to the servicemember's new home in Virginia would be designated "Germany–Virginia."

ocean common carriers. Statement of Facts ¶¶ 9–10. ISA members receive discounted ocean rates from TAAFLO in exchange for committing to ship a specified volume of cargo over a set period of time. As compensation for acting as ISA's agents, Pasha and Gosselin receive a set commission fee. Statement of Facts ¶ 10.

Second, Pasha and Gosselin act as General/Booking Agents for many of their customers. MTMC requires each carrier to appoint a General/Booking Agent to serve as its local representative in Germany to receive bookings. Statement of Facts ¶ 7. As a General/Booking Agent, Defendants offer their customers the option to purchase ocean transportation together with foreign inland services (packing, trucking, and port services) that the Defendants procure from local foreign agents. Statement of Facts ¶ 12. Defendants then bill the carriers the rate fixed by the ISA–TAAFLO service contract for ocean transportation (which includes Defendants set commission) plus the rate for the foreign inland services. *Id.* This combined rate is referred to as the "landed rate." *Id.* A "landed rate" is essentially an offer to obtain foreign inland services for the carrier and then to bill those services together with the ISA–TAAFLO service contract rate for the ocean shipping. *Id.*

*The Alleged Price Fixing Conspiracy*

The Government states that in the initial filing for the summer of 2002 (which occurred in 2001), a U.S. freight forwarder (or carrier—referred to hereinafter as "FF–1") filed the prime rate in 26 of 52 channels from Germany to the United States. Statement of Facts ¶ 18. FF–1 did not use the landed rate of either Defendant. *Id.* In 12 of these 26 channels, FF–1's through rates were at least $3.00 per hundredweight lower than those carriers using Defendants' landed rates. *Id.* In December 2001, MTMC published FF–1's bids, along with those of the next four lowest bidders. U.S. carriers then had until January 16, 2002 to file their second round "me-too" bids. Statement of Facts ¶ 19.

On December 26, 2001, Gosselin's managing director sent an email to a landed rate competitor, an unindicted co-conspirator, identifying the 12 channels. Statement of Facts ¶¶ 20, 21. Gosselin's managing director prepared a spreadsheet targeting those channels for elimination and sent it to the unidentified co-conspirator, saying that, by "not taking the low into consideration we would increase the rate level with an average of 3.63 USD ... This is the only thing that in my mind can happen." *Id.* The head of the unindicted co-conspirator organization responded, "[A]gree to your position ... You know if we do not reach and give [the] industry a clear message which rate to base the m/2 [me-too] on, then everyone will use the low [prime] rate and later expect us [the landed rate providers] to reduce our rates so those carriers can work under their m/2 rates." *Id.*

Gosselin sent these emails to the chief executive of Pasha with the note, "I don't know where you are at this moment with [the landed rate to a Pasha freight forwarder] but what rate levels would you be able to support if those [12] states would go to the second level? I think it is important we move rather quickly now. Maybe when you have a chance we can talk in the next days." Statement of Facts ¶ 21. Pasha thereafter allegedly agreed with Gosselin to act to eliminate the prime through rates in 12 of the 26 channels and replace them with higher rates at the second-low level. Statement of Facts ¶ 24.

To implement the agreement, Gosselin's managing director agreed to pay a specified rate to twelve of the largest German packing and hauling agents in return for

their agreement not to "handle business" for carriers in the 12 channels unless those carriers filed "me-too" rates at or above the second-low level. Statement of Facts ¶ 22.

On January 8, 2002, in a fax letter edited and approved by Gosselin's managing director, the agents informed U.S. freight forwarders that they "will offer their capacity only to those carriers me-tooing the second rate level into the [enumerated 12] states .... It was emphasized strongly that business to these states will only be handled at the second low rate level, so, me-too can only happen at this level." Statement of Facts ¶ 23. Gosselin sent a copy of this fax to Pasha on January 9, 2002. *Id.*

Through correspondence with FF–1 in the United States, Defendants agreed with FF–1 that it would cancel its prime rates in the 12 targeted channels, on the understanding that no other U.S. freight forwarder would me-too those prime through rates or file a rate below the second-low level. Statement of Facts ¶ 27. To deliver on their promise to FF–1, Defendants obtained the agreement of most of the other U.S. freight forwarders not to me-too the prime through rates in those 12 channels, but instead to file me-too rates at or above the second-low level. *Id.* The carriers overwhelmingly filed me-too through rates at or above the second low level in the 12 targeted channels. Statement of Facts ¶ 28. In the few instances where the carriers either ignored or misunderstood the instructions and filed me-too rates lower than the second-low level, Defendants directed them to agree to cancel those lower rates, and they did. Statement of Facts ¶¶ 29–30. Defendants also supplied misleading information to DOD personnel in Germany to ensure that DOD did not tender any shipments to a freight forwarder with a me-too rate on file below

the second-low level. Statement of Facts ¶¶ 29, 31.

The Government contends that as a result of the Defendants alleged conspiracy, DOD overpaid for the transportation of military household goods by approximately $1 million during the summer of 2002. Statement of Facts ¶ 33.

*The Parties Arguments*

The Defendants argue that the facts as stated above (as agreed to in the Statement of Facts) are a direct consequence of an initial agreement among local German agents to fix the terms and conditions under which they would provide packing services and local trucking services in Germany to U.S. carriers. According to Defendants, the German agents agreed among themselves, in advance of the ITGBL carriers' decision regarding what rates to file with MTMC, not to provide service for any carrier that filed rates with MTMC below a certain level. The German agents thereafter undertook to inform the industry of their agreement and acted to ensure that it would be carried out within the framework of MTMC's regulatory program. *See* Mem. of the Pasha Group in Supp. of Mot. to Dismiss Criminal Information (hereafter referred to as "Pasha Memorandum") at 6. Defendants contend that they had a duty to inform their ITGBL carrier customers of the German Agents' actions, which comprise the Government's charge of conspiracy.

Defendants maintain that Section 1706(a)(4) of the Shipping Act (46 U.S.C. app. § 1706(a)(4)) provides that the antitrust laws allow them an exemption, because their business "concern[ed] the foreign trade segment of through transportation." Section 1706(a)(4) of the Shipping Act provides:

The antitrust laws do not apply to —

(4) any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade.

Defendants contend that this statutory language is broad, with little definition of the terms. Defendants further argue that *United States v. Tucor,* 35 F.Supp.2d 1172 (N.D.Cal.1998), *aff'd,* 189 F.3d 834 (9th Cir.1999), has facts analogous to those at hand, and supports the Defendants' statutory interpretation.

Regardless, even if the Court found that Section 1706(a)(4) of the Shipping Act did not apply to Defendants, because the statute is so ambiguous, Defendants were not given a "fair warning" of criminal conduct, and the statutory and common law rules of lenity mandate that the Court dismiss the pending Criminal Information. Defendants note that they relied upon the holding in *Tucor* in making the determination that their conduct was legal.

Defendants also assert that, independent of Section 1706(a)(4) of the Shipping Act, Section 1706(a)(2) of the Shipping Act also gives Defendants immunity from the antitrust laws. Section 1706(a)(2)(B) states that the antitrust laws do not apply to:

"any activity or agreement within the scope of this chapter, whether permitted under or prohibited by this chapter, undertaken or entered into with a reasonable basis to conclude that … it is exempt under Section 1715 of this title from any filing or publication requirement of this chapter." See 46 U.S.C. app. § 1706(a)(2)(B).

Defendants contend that Subsection (a)(2)(B) references Section 1715 of the Shipping Act, which empowers the Federal Maritime Commission ("FMC") to exempt any class of agreements or any specified activity from application of the tariff filing requirements under the Shipping Act. Defendants opine that in order to show that the conduct in the Criminal Information is covered by Section 1706(a)(2)(B) immunity, they must show that (a) the FMC has exempted carriers such as Defendants from a filing or publication requirement pursuant to its authority under Section 1715 and (b) Defendants' conduct as described in the Statement of Facts constituted activities or agreements for which there was a reasonable basis to conclude that such activities or agreements fell within the scope of the Section 1715 exemption.

Defendants argue that one of the exemptions granted under Section 1715 covers the filing and publication requirements for tariffs in connection with "[t]ransportation of used military household goods and personal effects by ocean transportation intermediaries." *See* 46 C.F.R. § 520.13(c). "Ocean transportation intermediaries" include non-vessel owning common carriers ("NVOCC") and freight forwarders. *See* 46 U.S.C. app. § 1702(17). According to Defendants, they are classified in the Statement of Facts as a NVOCC and therefore they fall within the FMC's Section 1715 exemption from publishing tariffs for military household goods. Statement of Facts ¶ 9. Based on their status as a NVOCC and the resulting exception from having to publish tariffs, Defendants are afforded by statute broad immunity against the antitrust laws.

Defendants also assert that they have immunity against the antitrust laws through Section 7(c)(1) of the Shipping Act. This Section reads:

Any determination by an agency or court that results in the denial or removal of the immunity to the antitrust laws set forth in subsection (a) of this section shall not remove or alter the antitrust

immunity for the period before the determination.

Defendants opine that if the Court were to find that they did not have immunity in this case, this section prevents the Government from prosecuting them for antitrust violations, because they had antitrust immunity for the period before the Court determined that immunity did not apply.

Defendants also assert that the alleged fraud violation is premised on the same conduct that allegedly constitutes the charged antitrust violation. Therefore, Defendants argue, if the Court finds that it has antitrust immunity, it must also dismiss the fraud count.

The Government argues that the Defendants story regarding the German agents conspiracy is outside the scope of the Criminal Information and the Plea Agreement, which all parties agreed to. Therefore, the Government maintains that the Court cannot consider any of these assertions by Defendants.

In addition, the Government contends that *Tucor* does not apply in this case. The Government argues that *Tucor* involved Filipino shippers who shipped only within the Philippines and thus concerned *only* the foreign inland segment of through transportation. The Government maintains that Defendants conduct constituted a conspiracy that not only focused on the foreign inland segment of the transportation—from military bases in Germany to the German port—but extended to the United States.

The Government argues that Defendants reading of the statute raises a perverse escape valve for many antitrust violators doing business overseas that Congress could not have intended. The Government opines that Defendants main argument—that even if they were involved in through transportation, their conduct did "[concern] the foreign inland segment of through transportation"—is over broad.

The Government also argues that the Shipping Act's 1706(a)(4) immunity does not apply to Defendants. The Government contends that the antitrust immunities provided for in Section 7 apply only to agreements "by or among ocean common carriers" and "marine terminal operators" as set forth in Section 4 of the Act. The Government submits that this case does not concern ocean common carriers or marine terminal operators. Therefore, the Government concludes, immunity is not applicable here.

The Government also opines that Defendants' argument for lenity is misguided. Specifically, the Government maintains that the Court should only adhere to the rule of lenity when a statute is so ambiguous that the Court can make no sensible interpretation of it. In addition, the Government argues that most statutes are ambiguous to a degree, and the Court would create bad precedent by finding this particular statute ambiguous.

In addition, the Government contends that the Court should fully read Section 1715 of the Shipping Act, which permits the FMC to exempt from filing, "by order or rule . . . any class of agreements between persons subject to this chapter or any specified activity of those persons from any requirement of this chapter if it finds that the exemption will not result in substantial reduction in competition or be detrimental to commerce." The Government opines that the agreement between Defendants referenced in the Criminal Information directly flies in the face of this rule because it fixes the market and is detrimental to both competition and commerce.

The Government also maintains that the exemption authority that Defendants cite,

46 C.F.R. §§ 531 and 536, only exempt Defendants from filing tariffs. It does not extend to any activity associated with the filing of that tariff—in this instance the antitrust violation. The Government contends that the FMC concluded that "existing tariff filings no longer served any regulatory purpose" because MTMC had its own competitive bidding program. 46 Fed.Reg. at 35092. The Government asserts that the FMC's reliance upon competitive bidding in its actions to exempt carriers such as Defendants from filing tariffs only proves that its intent was not to also exempt antitrust, anti-competitive behavior.

The Government also claims that Section 7(c)(1) immunity does not apply in this situation because Defendants never had any form of antitrust immunity. The Government further contends that Section 7(c)(1) applies to agreements that have been filed with the FMC, and have been effective under the Act or have otherwise been entitled to immunity. The Government asserts that Defendants agreements were never filed with the FMC, and thus, are not covered under this statutory provision. The Government further maintains that the legislative history states that the provisions of Section 7(c)(1) are to protect agreements filed in good faith and valid on their face, while a Court or other tribunal makes a determination as to whether immunity applies or not.

Finally, the Government opines that even if the Court grants antitrust immunity in this case, it can prosecute Defendants under the fraud statute. The Government postulates that where the same conduct violates two different criminal statutes, it can prosecute and punish under both statutes, as long as each statutory provision requires proof of a fact which the other does not.

## DISCUSSION

### Standard of Review

■ A motion to dismiss tests whether the Criminal Information sufficiently charges an offense. *United States v. Brandon*, 150 F.Supp.2d 883, 884 (E.D.Va. 2001), aff'd, 298 F.3d 307 (4th Cir.2002) (citing *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962)). A Criminal Information must contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." *Id.* (citing Fed. R.Civ.P. 7(c)(1)).

■ A Court's analysis must extend beyond determining whether the Criminal Information contains the core elements of the charged crime. *Brandon*, 150 F.Supp.2d at 885. A Criminal Information should be dismissed if its factual allegations, even if proven beyond a reasonable doubt, fail to constitute the crimes charged. *Id.* If the "infirmity in the prosecution is essentially one of law," the Court may, on a motion to dismiss, decide whether the Criminal Information charges a crime. *United States v. Salman*, 266 F.Supp.2d 1367, 1373 (M.D.Fla.2003).

### ANALYSIS

#### A. Defendants Version of the Alleged Conspiracy

The Court holds that it cannot consider in its analysis of this case the additional facts that Defendants supply, concerning an initial price-fixing agreement among German agents. This agreement was not within the Statement of Facts. All of the parties, Gosselin, Pasha, and the Government, have agreed that the Statement of Facts and the Criminal Information form the entire factual record for purposes of the Defendants' Motions to Dismiss. *See* Plea Agreement ¶ 3.

Ordinarily, in deciding a motion to dismiss, the "indictment must be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Hall,* 20 F.3d 1084, 1087 (10th Cir.1994); *accord Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952).

In this case before the Court, the parties have agreed upon a Statement of Facts. Defendants have, in their pleadings, suggested a number of facts involving another agreement with German agents that influenced their actions. These facts are outside the factual record and this Court cannot consider them in its analysis. *See also United States v. Critzer,* 951 F.2d 306, 307 (11th Cir.1992).

### B. 1706(a)(4) Immunity Under the Shipping Act and Lenity

Even without considering the additional facts that Defendants supply in their Motions to Dismiss, the Court holds that Section 1706(a)(4) of the Shipping Act gives antitrust immunity to the Defendants. In the alternative, the statute is so ambiguous, that the rule of lenity mandates that the Court construe the statute in favor of Defendants.

In interpreting a statute, the Court must first begin with the text. "The starting point for [the] interpretation of a statute is always its language." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). "In analyzing a statute, we begin by examining the text, not by psychoanalyzing those who enacted it." *Carter v. United States,* 530 U.S. 255, 271,

120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (Thomas, J.) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992)) and (quoting *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.,* 516 U.S. 264, 279, 116 S.Ct. 637, 133 L.Ed.2d 635 (1996) (Scalia, J., concurring in part and concurring in judgment)). Neither the Supreme Court nor any court in this judicial circuit, has interpreted the sections of the Shipping Act at issue here.

The Supreme Court commonly interprets statutory terms according to their common meaning. *See generally* William N. Eskridge, Jr., et al., *Legislation and Statutory Interpretation* 253 (2000) (discussing ordinary meaning canons of statutory construction). If the plain language does not settle the question, then the Court looks to other sources, such as the legislative history, to decipher the meaning of the ambiguous language. In a criminal case, ambiguous language must be interpreted in defendant's favor under the rule of lenity. *See Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980); *United States v. Plaza Health Laboratories, Inc.,* 3 F.3d 643, 649 (2d Cir.1993).

Examining the plain meaning of the statute, Section 1706(a)(4) of the Shipping Act states:

The antitrust laws do not apply to —

(4) any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade.

Unfortunately, "concerning" is not defined within the Shipping Act. However, "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common mean-

ing." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). The common definition of concerning, which Defendants cite, is "to relate to; to be about; to bear on." Merriam–Webster Online Dictionary, available at *http://www.merriam-webster.com* (last visited August 1, 2004). A "foreign inland segment" is designed as the foreign non-ocean part of transportation. 46 U.S.C. app. § 1702(12). "Through transportation" means continuous transportation between origin and destination for which a single rate is charged and which is performed by one of more carriers between the United States and a foreign port. 46 U.S.C. app. § 1702(24) (2003).

■ Applying the plain meaning of the statute, the Statement of Facts is clear that Defendants' activity did "concern" the "foreign inland segment" of the through transportation. For example, Defendants provided local agent service in Germany. Criminal Information at ¶ 3. Local German agents provided services in Germany. *Id.* at ¶ 10. Defendants arranged for local German agent services, European port agent services, and ocean transport. *Id.* at ¶ 12.

In addition, one other court, although not the Supreme Court and not a court within the Fourth Circuit, has interpreted this issue on a set of facts somewhat similar to those now before the Court. *United States v. Tucor Int'l, Inc.,* 35 F.Supp.2d 1172 (N.D.Cal.1998), *aff'd,* 189 F.3d 834 (9th Cir.1999), remains the only judicial interpretation of the Shipping Act's antitrust exemption as applied to shipping household goods for Government personnel. In *Tucor,* the defendants transported military household goods in the Philippines. In that case, the Government charged the defendant with agreeing to eliminate the low prices bid by freight forwarders to the Government and to

cause freight forwarders to cancel their low rates. The indictment at issue in *Tucor* charged that defendants "caused U.S. freight forwarders to cancel their low rates filed with the U.S. for the transportation of military shipments of household goods between the Philippines and the United States." *Tucor* Indictment ¶ 4(c).

After reviewing the structure of the Shipping Act, the *Tucor* court concluded that Section 1706(a)(4) immunity "means what it says." *Tucor,* 35 F.Supp.2d at 1180, and held that the antitrust laws do not apply to an agreement or activity to raise prices or boycott freight forwarders that *concerns* the foreign inland segment of through transportation.

The Court also reviewed the legislative history of the Act for any evidence of Congressional intent that might be contrary to the plain language of the statute. The *Tucor* court found none. *See id.* at 1181–82. Specifically, the *Tucor* court held

"Most notably, there is no discussion in the 98th Congress of the scope of the foreign inland segment immunity. Accordingly, the Court is left to draw inferences from earlier legislative history on previous unenacted versions of the bill. Certainly these inferences, even if on balance they favored the government's position, which they do not, would be insufficient to overcome the plain meaning of the Act." *Id.* at 1182.

The Ninth Circuit unanimously affirmed the decision of the District Court. In particular, the court held that "section 1706(a)(4) clearly applies to any agreement—without limitation—concerning the foreign inland segment of through transportation." *U.S. v. Tucor Intern. Inc.,* 189 F.3d 834, 837 (9th Cir.1999).

The Government argues that Defendants reliance on *Tucor* is unfounded. The Government argues that *Tucor* dealt

with Filipino movers who moved items internally within the Philippines. The Government contends that because Defendants' alleged conspiracy involved contact with carriers and contacts with the United States, the holding in *Tucor* is inapplicable here. The Government also argues that 1706(a)(4) immunity does not apply to Defendants because the antitrust immunities provided for in Section 7 apply only to agreements "by or among ocean common carriers" and "marine terminal operators" as set forth in Section 4 of the Act. Government argues that this case does not concern ocean common carriers or marine terminal operators—therefore immunity is not applicable here.

The Government's arguments that this exemption only applies to ocean common carriers and marine terminal operators carries little weight. This is the exact same argument that the *Tucor* court addressed. *Tucor* recognized that section 1706(a)(4) clearly, on its face, was not limited to ocean-common carriers. *Tucor*, 35 F.Supp.2d at 1178, 1180. Because the statutory language was clear, the court concluded that legislative history was necessary only "to determine whether there [was a] clearly expressed legislative intent that is contrary to the plain language." *Id.* at 1181. The court found that the Shipping Act's legislative history actually favored the defendants' position. *Id.* at 1181–82.

Under a basic reading of the statute, Defendants' actions do "concern" the foreign inland segment of through transportation and should be exempted. The case is somewhat similar to the facts in *Tucor*. In *Tucor*, the defendants transported military household goods in the Philippines, and the Government indicted them on violations of the Sherman Act, charging a price fixing conspiracy that affected the United States. The difference between *Tucor* and

this case is that in *Tucor*, the Defendants' actions stopped at the edge of the Philippines. The *Tucor* defendants only moved goods within the country itself. In this case, Defendants' respective companies are involved in all aspects of the move—both the foreign inland segment as well as the entire trip. However, a basic reading of the statute concludes that Defendants' business "concerns" the foreign inland segment.

Even assuming *arguendo*, that Defendants were not immune from the antitrust laws pursuant to Section 1706(a)(4) of the Shipping Act, the rule of lenity mandates that the Court construe the statute in favor of the Defendants. *See United States v. Plaza Health Laboratories, Inc.,* 3 F.3d 643, 649 (2d Cir.1993) (holding that the court must decide ambiguities in the statute in the defendants favor).

The Court finds that this statute is clear. Defendants' behavior did concern a foreign inland segment of through transportation. However, the Court does acknowledge that different definitions of "concern" exist. This Court uses the common definition of concern, which means "to relate to; to be about; to bear on." Merriam–Webster Online Dictionary, available at *http://www.merriam-webster.com* (last visited August 1, 2004); *see also Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

The Government could argue that Congress's intent was a heightened definition of the word "concern"—such that in order to enjoy antitrust immunity Defendants' conduct would have needed to be exclusively—or significantly—relating to the foreign inland segment of through transportation. There is no indication in the legislative history that Congress meant this. In fact, there is no legislative discussion regarding the scope of the foreign inland segment immunity. *See Tucor*, 35

F.Supp.2d at 1182. However, this ambiguity, to the extent it even exists, only favors the Defendants.

Although the Government is correct in pointing out that all statutes, to an extent, are ambiguous, *see Muscarello v. United States,* 524 U.S. 125, 138, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), the rule of lenity applies only if "after seizing everything from which aid can be derived . . . we can make 'no more than a guess as to what Congress intended.' " *Id.* This is the case here. Congress failed to define what "concerning" means. Specifically, whether "concerning" should be given a broad or narrow definition. This Court uses the common definition of the word. There is no doubt that *Tucor* held that any conduct dealing with the foreign inland segment of through transportation is immune under the Shipping Act. Based upon this holding, it is not unreasonable for the Court to conclude that Defendants conducted their business in accordance with the Ninth Circuit's holding. Therefore, to the extent that an ambiguity exists in the immunity clause under Section 1706(a)(4) of the Shipping Act, this Court must construe it in favor of the Defendants.

### C. Shipping Act Immunization Under Section 1706(a)(2)

█ The Court holds that independent of the antitrust immunity Defendants enjoy pursuant to a plain reading of Section 1706(a)(4) of the Shipping Act, Defendants shipping activity involving military household goods is exempt from the Federal Maritime Commission's tariff filing and publication requirements, and thus is immunized from antitrust scrutiny under Section 1706(a)(2) of the Shipping Act.

---

**2.** A common carrier is defined in the Shipping Act as including non-vessel operating common carriers, which both Gosselin and

Once again, the Court's starting point in analyzing this statute is with its plain language. See *Community for Creative Non–Violence,* 490 U.S. at 739, 109 S.Ct. 2166. Section 1706(a)(2) of the Shipping Act provides that the antitrust laws do not apply to:

> any activity or agreement within the scope of this chapter, whether permitted under or prohibited by this chapter, undertaken or entered into with a reasonable basis to conclude that (A) it is pursuant to an agreement on file with the Commission and in effect when the activity took place, or (B) it is exempt under section 1715 of this title from any filing or publication requirement of this chapter.

Subsection (a)(2)(A) is inapplicable to this case because Defendants' agreement is not on file with the Federal Maritime Commission. Within the scope of the chapter is Section 1707 of the Shipping Act, which requires common carriers to publish tariffs.[2] However, subsection (a)(2)(B) references Section 1715 of the Shipping Act, which empowers the Federal Maritime Commission to exempt any class of agreements or any specified activity from application of the tariff.

The Federal Maritime Commission, in rules entitled "Carrier Automated Tariffs," exempts used military household goods transported by ocean transportation intermediaries from publishing a tariff. Defendants also fall within the definition of an ocean transportation intermediary. 46 U.S.C. app. § 1702(17). The exemption states:

> (c) The following cargo types are not subject to the requirements of this part [automated tariffs]: . . .

Pasha are. *See* Statement of Facts ¶ 9; *see also* 46 U.S.C.App. §§ 1702(6) and (17)(B).

(3) *Used military household goods.* Transportation of used military household goods and personal effects by ocean transportation intermediaries.

46 C.F.R. § 520.13(c)(3)(2003) (emphasis in original)

The Court holds that Defendants have a "reasonable basis to conclude," based upon a reading of the above statutes, that they are immune from the antitrust laws because the publication exemption is explicit.

The Government argues two major points against this theory, both of which the Court finds unpersuasive. First, the Government argues that Section 1706(a)(2) immunizes only agreements "within the scope of this chapter." In turn, the Government contends that Section 4 of the Shipping Act "makes clear that the only agreements within the scope of this chapter are agreements among ocean carriers or marine terminal operators." Mem. of the United States in Opp. to Gosselin World Wide Moving N.V.'s and the Pasha Group's Mots. to Dismiss the Criminal Information at 22. The Government contends that neither Defendant is an ocean carrier or a marine terminal operator. This argument carries no weight, and is simply a rehash of the Government's argument before the District Court in *Tucor*.

Section 4 of the Shipping Act, entitled "Agreements Within Scope of Act," states that the Shipping Act applies to certain agreements "by or among ocean common carriers," and "among marine terminal operators and one or more ocean common carriers." See 46 U.S.C. app. § 1702(a) (ocean common carriers), § 1702(b) (marine terminal operators). The Government's argument, in essence, is that this language means that the Shipping Act applies to certain agreements among *only* ocean common carriers and marine terminal operators.

As in *Tucor*, the Court finds that the Government has misinterpreted the "gap" filled by Section 1704(a) of the Shipping Act. Section 1704(a) exempts Federal Maritime Commission from filing "agreements related to transportation to be performed within or between foreign countries . . ." See 46 U.S.C. app. § 1704(a). As in *Tucor*, "[t]he government's argument ignores the fundamental distinction between 'transportation to be performed within or between foreign countries' and 'the inland segment of through transportation.' " *Tucor*, 35 F.Supp.2d at 1180. The Shipping Act cannot apply, as the Government argues, to certain agreements among *only* ocean common carriers and marine terminal operators because under such a theory, the statute under 1704(a) would be illogical. Ocean common carriers and marine terminal operators do not operate *within* a foreign country. It is obvious that this language deals with internal transportation, which would preclude ocean common carriers and marine terminal operators.

The Government also argues that Defendants' agreement is not exempted by Section 1715 of the Shipping Act. Section 1715 permits the Federal Maritime Commission to exempt from filing, "by order or rule," "any class of agreements between persons subject to this chapter if it finds that the exemption will not result in substantial reduction in competition or be detrimental to commerce." However, again the Government misinterprets the statute. The statute does not say that the only way Defendants could seek a tariff exemption is through an order or rule by the Federal Maritime Commission. The plain language of the statute states that the Federal Maritime Commission may issue this order or rule exempting a party from the tariff requirement. This Section does not reference Section 1706(a)(2) of the Shipping Act, which Defendants rely upon.

Based upon the above statutory and case law analysis, the Court holds that independent of antitrust immunity Defendants enjoy pursuant to a plain reading of Section 1706(a)(4) of the Shipping Act, Defendants' shipping activity involving military household goods is exempt from the Federal Maritime Commission's tariff filing and publication requirements, and thus is immunized from antitrust scrutiny under Section 1706(a)(2) of the Shipping Act.

### D. Immunity Under Shipping Act Section 1706(c)(1)

The Court holds that under Section 7(c)(1) of the Shipping Act (codified at 46 U.S.C. app. § 1706(c)(1)), Defendants are entitled to retroactive immunity under the Shipping Act. However, this argument is moot because the Court finds that Defendants already have immunity under a plain reading of Section 1706(a)(4), and alternatively under the statutory and common law rules of lenity.

As described above, Defendants have immunity from the antitrust laws. However, even assuming arguendo, that Defendants did not have immunity under the antitrust laws, Section 1706(c)(1) would grant Defendants retroactive immunity. Section 1706(c)(1) reads:

> Any determination by an agency or court that results in the denial or removal of the immunity to the antitrust laws set forth in subsection (a) of this section shall not remove or alter the antitrust immunity for the period before the determination.

Once again, the Court's starting point in analyzing this statute is with its plain language. See *Community for Creative Non–Violence*, 490 U.S. at 739, 109 S.Ct. 2166. In examining the plain language of this statute, it is apparent that the purpose of this section is to not penalize parties who in good faith believe that they have antitrust immunity, if a Court takes that immunity away.

█ The Court finds that, based upon the Ninth Circuit's decision in *Tucor*, that the Defendants acted in good faith in considering their actions immune from the antitrust laws. Based upon the Ninth Circuit's holding in *Tucor*, the Defendants could have reasonably concluded that they had antitrust immunity in their activities abroad. This statute expressly prohibits the retroactive application of the removal or denial of immunity under the statute. *Tucor*, 35 F.Supp.2d at 1181–82. Based upon these factors, Defendants would enjoy retroactive immunity.

### E. Independent Basis for Fraud

The Court holds that the Government states a basis for fraud against Defendants, independent of the Sherman Act violations. "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In *Whalen v. United States*, 445 U.S. 684, 691, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), the Supreme Court held that courts are to apply this "rule of statutory construction," described in *Blockburger*, "to determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively." *Id.*

█ In this case, the Sherman Act count and the fraud count both require proof of a fact that the other does not. The Sherman Act count requires that the Government show that Defendants had an effect on interstate or foreign commerce

but not an effect on the Government. The fraud count, under 18 U.S.C. § 371, requires that the Government show that Defendants defrauded the Government. Section 371 does not require that the Government show that Defendants alleged fraud had an effect on commerce. *See generally United States v. Ashley Transfer & Storage Co.*, 858 F.2d 221, 223–24 (4th Cir.1988). The Court has held that Defendants' conduct enjoys antitrust immunity under the Sherman Act. However, applying the *Blockburger* test, the Court concludes that Congress has provided that the Government can prosecute both the Sherman Act count and the fraud count cumulatively. The fact that the Court has found Defendants' conduct under the Sherman Act immune is irrelevant. The Government must, under the fraud count, prove that Defendants defrauded the United States. This is conduct that the Government need not prove under the Sherman Act count.

Defendants argue that conduct that is immune under one law cannot properly serve as the basis of a legal violation under another statute. Defendants contend that this principle is articulated in *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 129 F.Supp.2d 578 (W.D.N.Y.), *aff'd*, 229 F.3d 1135 (2d Cir.2000), *cert. denied*, 532 U.S. 1037, 121 S.Ct. 1998, 149 L.Ed.2d 1001 (2001). The Court disagrees. *Bath Petroleum* was a civil action involving a claim against competitors for making false statements to federal and state administrative agencies that caused plaintiff's business venture to fail. The plaintiff in this case sued the defendants for violating Section 2 of the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The *Bath Petroleum* court dismissed the Sherman Act claim based on the Noerr–Pennington doctrine, which immunizes conduct from the antitrust laws that is directed toward

influencing governmental action, such as lobbying or litigation. Defendants argue that since the RICO claim was based upon the same allegedly false statement immunized from antitrust liability by the Noerr–Pennington doctrine, the court also barred the RICO claim. This is not the holding of *Bath Petroleum*. In *Bath Petroleum*, that court held that the Noerr–Pennington immunity applies equally to RICO claims. *See also International Broth. of Teamsters v. Philip Morris*, 196 F.3d 818, 825 (7th Cir.1999). In other words, although the Noerr–Pennington doctrine originated in antitrust law, its rationale is equally applicable to RICO suits. *Id.* at 826.

Defendants also rely on the Tenth Circuit's holding in *United States v. Beachner Constr. Co.*, 729 F.2d 1278, 1284 (10th Cir. 1984). In *Beachner*, the court held that the double jeopardy clause barred a second trial of mail fraud and antitrust claims against a defendant where the retrial involved the same conspiracy for which the defendant had already been acquitted. *Beachner* did not suggest that the Government would have been foreclosed from prosecuting defendants for mail fraud at the first trial if the antitrust charges had been dismissed. Therefore, the Court holds that the Government states a basis for fraud against Defendants, pursuant to 18 U.S.C. § 371, that is independent of the Sherman Act count.

## *CONCLUSION*

In conclusion, Defendant Gosselin's Motion to Dismiss the Information for Failure to State an Offense is partially granted, and Defendant Pasha's Motion to Dismiss Criminal Information is also partially granted.

First, the Court holds that under a plain reading of Section 1706(a)(4) of the Shipping Act, Defendants' activity does "con-

cern" the foreign inland segment of through transportation. As such, Defendants' alleged conduct is immune from the antitrust laws pursuant to the Shipping Act's antitrust immunity provisions.

Second, even assuming *arguendo,* that Defendants' alleged conduct was not immune from the antitrust laws under a plain reading of Section 1706(a)(4), the Court holds that as a matter of law, the statutory and common law rules of lenity mandate partial dismissal of the pending criminal information.

Third, the Court holds that independent of Defendants' antitrust immunity pursuant to a plain reading of Section 1706(a)(4) of the Shipping Act, Defendants' shipping activity involving military household goods is exempt from the Federal Maritime Commission's tariff filing and publication requirements, and thus is immunized from antitrust scrutiny under Section 1706(a)(2) of the Shipping Act.

Fourth, the Court holds that under Section 7(c)(1) of the Shipping Act (codified at 46 U.S.C. app. § 1706(c)(1)), Defendants are entitled to retroactive immunity under the Shipping Act. However, this argument is moot because the Court finds that Defendants have immunity under a plain reading of Section 1706(a)(4), and alternatively under the statutory and common law rules of lenity.

Fifth, the Court holds that the Government states a basis for fraud against Defendants, independent of the Sherman Act violations. Where the same conduct violates two different criminal statutes, the Government can prosecute and punish it under both statutes, as long as each statutory provision requires proof of a fact which the other does not.

For the foregoing reasons, it is hereby ORDERED that Defendant Gosselin World Wide Moving N.V.'s Motion to Dismiss the Information for Failure to State an Offense is PARTIALLY GRANTED.

It is FURTHER ORDERED that Defendant Pasha Group Inc.'s Motion to Dismiss Criminal Information is PARTIALLY GRANTED.

The Court DISMISSES Count One of the Criminal Information.

The Clerk is directed to forward a copy of this Order to counsel.